UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SECURITIES AND EXCHANGE          .
COMMISSION,                      .
                                 .
        Plaintiff,               .   CA No. 10-1277 (ESH)
                                 .
   v.                            .
                                 .   Washington, D.C.
CITIGROUP, INC.,                 .   Monday, August 16, 2010
                                 .   2:00 p.m.
        Defendant.               .
                                 .
. . . . . . . . . . . . . . ..

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          ERICA Y. WILLIAMS, ESQ.
                            LAURA B. JOSEPHS, ESQ.
                            U.S. Securities and Exchange
                            Commission
                            100 F Street, NE
                            Washington, DC 20549
                            202-551-4450

For the Defendant:          CHARLES E. DAVIDOW, ESQ.
                            BRAD S. KARP, ESQ.
                            SUSANNA BUERGEL, ESQ.
                            Paul, Weiss, Rifkind,
                            Wharton & Garrison, LLP
                            2001 K Street, NW
                            Washington, D.C. 20006-1047
                            202-223-7380

                            JONATHAN M. MOSES, ESQ.
                            Wachtell, Lipton, Rosen & Katz
                            51 West 52nd Street
                            New York, NY 10019
                            212-403-1388

For the Movant:                    MATTHEW E. MILLER, ESQ.
                                   JONATHAN W. CUNEO, ESQ.
                                   Cuneo Gilbert LaDuca, LLP
                                   507 C Street, NE
                                   Washington, D.C. 20002
                                   202-587-5067

Court Reporter:                    BRYAN A. WAYNE, RPR, CRR
                                   Official Court Reporter
                                   U.S. Courthouse, Room 6714
                                   333 Constitution Avenue, NW
                                   Washington, D.C. 20001
                                   202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1                    P R O C E E D I N G S

2          THE DEPUTY CLERK:  Your Honor, we have civil action

3    10-1277, Securities & Exchange Commission versus Citigroup, Inc.

4    I'm going to ask that counsel please approach the lectern,

5    identify yourself and those at your respective tables, starting

6    with the plaintiff's counsel.

7          MS. WILLIAMS:  Good afternoon, Your Honor.  Erica

8    Williams for the plaintiff, Securities & Exchange Commission,

9    and I'm accompanied by Laura Josephs.

10          THE COURT:  Good afternoon.

11          MR. DAVIDOW:  Good afternoon, Your Honor.  Charles

12    Davidow from Paul, Weiss, Rifkind, Wharton & Garrison on behalf

13    of the defendants.  With me and presenting argument will be my

14    partner, Brad Karp, whom Your Honor has already admitted pro hac

15    vice.  Also at the table is Susanna Buergel from Paul Weiss;

16    Jonathan Moses from Wachtell, Lipton, Rosen & Katz; and P.J.

17    Mode from Citigroup.

18          THE COURT:  Good afternoon.

19          MR. MILLER:  Your Honor, also present here today are

20    counsel for proposed amicus Stanley Lerner.  I'm Matthew Miller,

21    along with Jonathan Cuneo of Cuneo, Gilbert, LaDuca.  We would

22    like to be heard if permitted to by the Court, but otherwise

23    we'll be seated in the back of the room.

24          THE COURT:  Let me ask if anybody is going to oppose

25    their motion to appear as amicus curiae.

1          MS. WILLIAMS:  Yes, Your Honor.  We plan to oppose the

2    motion to appear as amicus.

3          THE COURT:  On what grounds?

4          MS. WILLIAMS:  On the grounds that we believe that we

5    adequately represent the interests of the investors, and that

6    the proposed amicus do not have any unique perspective that the

7    SEC is not already able to represent.  Additionally, we believe

8    that the proposed amicus is not here to appear as a neutral

9    friend of the Court, but rather to advance the interests of the

10   derivative shareholder action that he has filed in state court

11   in New York.

12      And also, Your Honor, the claims that the proposed amicus

13   has brought against former and current Citigroup directors,

14   officers, and employees for breaches of fiduciary duty are very

15   different from the claims that the SEC has brought in this

16   action, which deal with enforcement of the federal securities

17   laws.  So the relief that he is seeking and the claims that he

18   has brought are much better attended to in the action that he

19   has filed in state court, and here the interests of investors

20   with respect to the enforcement of the federal securities laws

21   are adequately represented by the SEC.

22          THE COURT:  That remains to be seen.  What about the

23   Citigroup?  What's their position?  I'm sorry, you are?

24          MR. KARP:  I'm Brad Karp, Your Honor.  We agree with

25   the position of the SEC with respect to the relevance and

1     standing of the amicus to be heard by Your Honor.  As

2     Ms. Williams already noted, the amicus has made a demand on

3     Citigroup's board.  It has filed a derivative action which is

4     pending in New York Supreme Court.  There is a mechanism for the

5     amicus to assert the claims that he is seeking to assert here,

6     and I'm happy to get into the merits and address the merits if

7     Your Honor is interested.

8              THE COURT:  Merits of, I'm sorry, what?

9              MR. KARP:  The merits of the position taken by the

10    amicus in its brief.  We don't think they should be heard.  We

11    do understand that Your Honor has wide berth, however, to

12    consider whatever you think is appropriate.

13             THE COURT:  Well, I've already read it.  I don't know

14    that he could be an intervenor, but I'm not so sure -- the

15    problem here is that we have two people on either side, so to

16    speak, who are all in agreement.  So I have no other naysayer.

17    So I don't really see -- I understand that they have their

18    position and they want to -- they have an agenda just like

19    everybody else has an agenda here.  But it doesn't really serve

20    me very well not to hear from somebody who might have a

21    different perspective.

22        I'm not sure that you and the SEC are going to have

23    different perspectives about anything.  Why don't we put it off

24    for a moment so I can hear from the two parties here about the

25    settlement.  I've actually become familiar with what happened in

1    the Bank of America case, and I can understand exactly where the

2    judge's thinking was.

3        I look at this, sir, and I think, why would I find this

4    fair and reasonable and acceptable?  Here we have a situation

5    where the officers, people -- there's specific references to

6    officers, senior management.  Perhaps this goes to the SEC and

7    not to you.  But I'm a little baffled here about how the SEC,

8    who's supposed to be protecting the public and they vigorously

9    prosecute individuals, you've got a case here where you're

10   getting $180,000, and I have no part in that whatsoever as far

11   as I can tell, and then you come in and say, well, if we accept

12   the 75 million.

13       I have more questions than have been answered, that's for

14   sure.  I don't know who wants to start here.  But it's not based

15   on the amicus only that questions arise.  I'm astounded.  So you

16   have a lot of explaining, somebody.  You can start, whoever you

17   want.

18            MR. KARP:  It probably makes the most sense, frankly,

19   for the SEC to begin.  We're happy to complete the discussion --

20            THE COURT:  Right.  I have some specific questions for

21   the SEC, and then we'll move on.

22            MR. KARP:  Okay, Your Honor.

23            THE COURT:  Okay.  First of all, let me ask this.  You

24   indicated that the administrative proceeding involving the two

25   individuals is over, correct?  They made an offer of judgment,

1   you accepted it, they're off the hook as far as you're

2   concerned?

3           MS. WILLIAMS:  Yes, Your Honor.  The administrative

4   proceeding was filed as a settled action and the order has been

5   issued.

6           THE COURT:  Are there any other administrative

7   proceedings that are pending in this matter or will be pending

8   or are expected?

9           MS. WILLIAMS:  No, Your Honor.  There are no other

10  administrative proceedings that arise out of this investigation

11  regarding the misstatements concerning Citigroup's subprime

12  disclosures.

13          THE COURT:  Okay.  Is there a principled reason why

14  you come to court and ask for the approval of the Citigroup

15  settlement but not the individuals?

16          MS. WILLIAMS:  Yes, Your Honor.  We conducted a more

17  than two-year investigation in this case in which we took the

18  testimony of 14 individuals, we took the interviews of numerous

19  other individuals, and we analyzed 28 million pages of

20  documents.  And it was only after that more than two-year

21  investigation that we came and determined what the claims were

22  that would be appropriate to bring in this case.  And we brought

23  the claims that we felt were supported by the facts in the

24  record in accordance with the legal standard.

25      The claims against Citigroup, the company, for violations

1   of 17(a) of the Securities Act and Section 13(a) of the

2   Securities and Exchange Act were directly resulting from this

3   investigation.  And we have 40 paragraphs detailing the

4   communications, the documents, the events that happened that we

5   believe led to the misleading disclosures.

6        We also brought the administrative proceedings against the

7   former chief financial officer of Citigroup, Gary Crittenden and

8   the former head of investor relations, Arthur Tildesley, for

9   their role in causing certain of the disclosure violations.  We

10  used the facts in the record to determine what claims were

11  appropriate.  We considered bringing claims against the

12  individuals in federal court, but we determined that the facts

13  in the investigative record that we had developed most

14  appropriately supported the claims that we brought, for causing

15  the violations rather than for --

16        THE COURT:  You can't bring the causing in federal

17  court?  I don't understand.

18        MS. WILLIAMS:  No, Your Honor.  In federal court what

19  we would have to bring would be either an aiding and abetting

20  claim, which would involve us having to prove scienter and other

21  elements, and there is litigation risk associated with those,

22  and it also might have caused an extensive litigation.  But more

23  importantly, our factual record did not support bringing that

24  claim; it more appropriately supported bringing the causing

25  claim, which is a nonscienter claim that we brought against them

 1     in the administrative proceeding.

 2             THE COURT:  Well, when you bring this long complaint

 3     and make it sound like there have been all these misdeeds, who's

 4     responsible?  These things don't happen without individuals.

 5     You talked about corporate management.  Last time you told Judge

 6     Rakoff in New York -- not you but your colleagues -- that you

 7     couldn't do anything because you had been stonewalled, and as

 8     far as I could tell the SEC rolled over and deferred to an

 9     attorney-client privilege.  That's not a problem here, right?

10             MS. WILLIAMS:  No, it's not, Your Honor.  We do not

11     have any issues with attorney-client privilege.  We did a full

12     investigation in this case and we uncovered all of the facts

13     that we believe were out there.  So it's very different, I

14     believe, from the Bank of America situation.  Here, our

15     complaint is extremely detailed.  As Your Honor said, it goes

16     through the events and circumstances that happened.

17         And to answer Your Honor's question as to how the

18     misleading disclosures came about, our understanding is that

19     there were internal documents in Citigroup in April and July of

20     2007 that characterized the super-senior and liquidity put

21     assets --

22             THE COURT:  I'm sorry.  Could you go a little slower?

23             MS. WILLIAMS:  I'm sorry, Your Honor.  The

24     super-senior and liquidity put assets as having extremely low

25     risk and also not being something that should be included in the

1    company's subprime disclosures.  There were also internal

2    investment bank documents that we detail in our complaint that

3    included the super-senior and liquidity puts --

4         THE COURT:  You don't have to convince me there's

5    wrongdoing; what you have to convince me is that you're doing

6    something appropriate about it.  This complaint is very lengthy

7    and detailed.  You talk about senior management.  It isn't --

8    it's the same problem that you had in New York.  You come to a

9    judge and you say this is fair and reasonable.  You have a

10   litany of misdeeds, you call senior management intimately

11   involved, and the upshot of it is fairly unimpressive, really.

12        MS. WILLIAMS:  Your Honor, we again believe this is

13   very different from that circumstance.  In Bank of America, my

14   understanding is that they did not include in their proxy

15   disclosures and other documents certain information about $5.8

16   billion worth of bonuses that they agreed to pay Merrill Lynch

17   employees after the settlement, and that there was also missing

18   from the proxy statements information about the losses that

19   Merrill Lynch had suffered, and that those proxy materials were

20   drafted and approved in part by internal and external counsel.

21        Here what we have is a much different circumstance.  What

22   we have are different internal documents in the investment bank

23   and Citigroup that characterized the super-seniors and liquidity

24   puts, some as being part of the subprime exposure, and some as

25   being so low risk that they should be excluded from the subprime

1    exposures.

2        So what we detail in our complaint really is a breakdown in

3    communication at Citigroup, not some certain individuals

4    intentionally not including information about these assets in

5    the disclosures, but more of a breakdown in communication in the

6    disclosure process that resulted, and what SEC characterizes as

7    misleading disclosures concerning the subprime exposure.  So I

8    do believe you can factually distinguish this case from the Bank

9    of America case.

10        And also, with regard to Judge Rakoff's April 25, 2009

11   decision in which he initially rejected the settlement, our

12   complaint is much more detailed than the complaint that was set

13   before Judge Rakoff.  I know he did ultimately approve the

14   settlement for a $150 million penalty earlier this year, with a

15   much more detailed complaint, similar to the allegations we've

16   brought here, a detailed analysis of what happened.

17        THE COURT:  You have detailed analysis, but it hardly

18   strikes me -- if one reads this with at least an objective eye,

19   there is not the slightest hint that this is nothing more than a

20   miscommunication.  You say senior management was aware that the

21   super-senior tranches were the source of the increased losses.

22   The company nevertheless continued to exclude the approximately

23   $43 billion in subprime exposure.

24        This easily could be read to be at least misleading to the

25   investor if not something more.  The fact that it's detailed

1    doesn't give me any more solace in saying that in some way or

2    another, 75 million -- and I can't ignore the fact that two

3    people got off at 180,000.  How am I supposed to judge this?

4    What have you given me other than a detailed complaint that

5    makes me think that the defendants have done far more than

6    miscommunicated?

7             MS. WILLIAMS:  Well, first, with regard to the

8    paragraphs that you read, Your Honor, I will note that the

9    losses on the super-seniors and liquidity puts were included in

10   the disclosure.  So it's not that they knew about losses and

11   didn't disclose losses.  They did disclose the losses.

12            THE COURT:  In where, the proxy statements?

13            MS. WILLIAMS:  In the disclosures on the investor

14   calls, and additionally the losses were incorporated into an 8-K

15   that was filed with the Commission.

16            THE COURT:  You mean that somebody, if they read the

17   8-K, will read about the 43 billion?

18            MS. WILLIAMS:  The losses and the size of the assets

19   are two different things, Your Honor.  While they did disclose

20   the losses that had been suffered on the 43 billion, they did

21   not disclose the exposure of the 43 billion.

22            THE COURT:  What came to pass after this came out?

23   The stock tanks?

24            MS. WILLIAMS:  After this came out -- there were

25   actually a number of different releases that day.  We did

1    perform an economic analysis of the impact of the misleading

2    disclosures on the stock price, and what we determined was there

3    were a number of disclosures, including the resignation of

4    Citigroup's CEO on that day, so it's hard to pinpoint whether

5    the movement in the stock price was directly attributable to the

6    disclosure regarding subprime --

7           THE COURT:  Why don't you give me an example.  The

8    stock price went from what to what on November 1 to November 4,

9    so to speak?

10          MS. WILLIAMS:  Court's indulgence.  I'm not quite sure

11   what it went to on that day, but I know from the economic

12   analysis that our economist performed that they determined that

13   the stock had been inflated.  There was a range of pecuniary

14   gain that Citigroup may have received as a result of the

15   misleading disclosures.  That range, the upper limit of it, is

16   approximately $123 million.  The lower range is much lower than

17   that.

18          THE COURT:  123 million?

19          MS. WILLIAMS:  123 million.

20          THE COURT:  So how much did Mr. Prince walk away with?

21   Let's ask that question.  I really have a hard time

22   understanding this.  Mr. Prince walks away with over a hundred

23   million, right?

24          MS. WILLIAMS:  We don't have any evidence in our

25   investigative record that shows that any of the individuals at

1    Citigroup directly profited from the disclosures.  There was no

2    pecuniary gain or bonus provided to any of the individuals, from

3    what we can tell, as a result of the subprime exposure

4    disclosures.

5         What our economist determined based on this event study is

6    what would the stock price of Citigroup have looked like if they

7    had put forth full, complete disclosures, and they were only

8    able to estimate a range of possible pecuniary gain to the

9    company, and that range, the upward limit again was around

10   123 --

11        THE COURT:  Who, though, benefits from that upward

12   range?  Let's just take that as a range.  The upward limit of

13   123 million.  Don't you think the officers and directors are

14   direct beneficiaries of that?

15        MS. WILLIAMS:  I don't, Your Honor, necessarily.

16   There were people who, I suppose, stood to benefit if there were

17   any shareholders who may have cashed out at the time that the

18   stock was inflated.  What the SEC tried to focus on here in

19   proposing the $75 million penalty is how many shareholders may

20   have been harmed during that time, who may have purchased

21   Citigroup securities at artificially inflated prices.

22        So what we've put forth here is a settlement with a penalty

23   in accordance with the statutory requirements.  One of them in

24   order to determine a penalty is the benefit to the company, the

25   pecuniary benefit, which is why we did this economic analysis.

1    And we believe that the 75 million is towards the upper range of

2    the possible pecuniary benefit to Citigroup, which is why we

3    have proposed that as the penalty, and we have contemplated the

4    establishment of a fair fund in this case so that a hundred

5    percent of that $75 million could be distributed to Citigroup

6    shareholders who may have been harmed.

7              THE COURT:  You're saying all this; not a word of it's

8    in your pleading.  So 75 million gets distributed to whom?

9              MS. WILLIAMS:  The $75 million would be distributed,

10   the SEC contemplates, to harmed shareholders, and that is in a

11   paragraph in our proposed judgment, Your Honor.

12             THE COURT:  I don't know how you define a harmed

13   shareholder.

14             MS. WILLIAMS:  One of the things we wanted to do and

15   proposed in our judgment is that we propose a plan to the Court

16   at an appropriate time that identifies the shareholders who we

17   believe were harmed who should receive this recovery.  And that

18   plan would be subject to the Court's approval.  There are

19   currently private litigation against Citigroup, including a

20   class action.  Depending on the resolution of that case, we

21   believe that a distribution mechanism would be established and

22   that we could possibly use that mechanism to efficiently

23   identify the Citigroup shareholders who should receive recovery

24   from the 75 million.

25             THE COURT:  How can a court figure out whether

1   something's fair and reasonable if I don't know who constitutes

2   the benefitted group?  What if Mr. Crittenden, for instance,

3   bought a lot of stock at the inflated price?

4        MS. WILLIAMS:  If Mr. Crittenden is one of the

5   shareholders who bought at an inflated price, he would

6   presumably be like any other shareholder who bought at an

7   inflated price.  I'm not -- this is a hypothetical situation,

8   Your Honor, and I'm not sure that that is actually based on any

9   of the facts in the record.  But all the shareholders who

10  possibly were harmed by purchasing Citigroup securities at a

11  time when that price was inflated because of the misleading

12  subprime disclosures, the SEC has set up a mechanism by which we

13  hope to repay those people using the penalty.

14       THE COURT:  If you don't know how many people there

15  are or how much they spent or how much stock they bought, how do

16  we know that 75 million makes any sense?

17       MS. WILLIAMS:  We do know the estimated pecuniary gain

18  to the company.  We had our Ph.D. economist do this event study

19  to determine the pecuniary gain to Citigroup, which is one of

20  the methods that is set forth in the statute for the SEC to

21  determine appropriate penalty amount.  So I understand

22  Your Honor's concern.  If we can't determine how shareholders

23  were harmed, how do we know that the penalty is appropriate.

24  Well, the statute provides that pecuniary gain is one of the

25  methods that we can use here.

1          And we determined that that was one of the best methods.

2     We did contemplate other methods, but we determined that was one

3     of the best methods, because it did result in a range of

4     possible benefits.  So we wanted to have a settlement that had

5     some basis to it, Your Honor.

6          THE COURT:  You could look at the harmed shareholder,

7     who we don't know how that's defined, but then you say the

8     pecuniary gain to the company.  Who is the beneficiary of that?

9          MS. WILLIAMS:  The pecuniary gain to the company,

10    Your Honor, is the company shareholders.

11         THE COURT:  And therefore the company shareholders,

12    the people who benefit, the ones that really benefitted the most

13    are the biggest holders, right?

14         MS. WILLIAMS:  I believe that's accurate, Your Honor.

15         THE COURT:  And many of the largest shareholders at

16    the time are obviously senior management.

17         MS. WILLIAMS:  I actually cannot definitively say

18    that, Your Honor.

19         THE COURT:  Do you have any idea, when this complaint

20    was written and they talk about senior management, who are we

21    talking about?

22         MS. WILLIAMS:  Absolutely, Your Honor.  As I said, we

23    did a more than two-year investigation and took the testimony of

24    14 individuals and took numerous witness interviews, and so when

25    we drafted the complaint, we were well aware of the senior

1   management at the company who were referenced in the complaint.

2         THE COURT:  And who are they?

3         MS. WILLIAMS:  I'm not prepared to name all 14

4   individuals who gave testimony, but, for example, we took the

5   testimony of Mr. Crittenden --

6         THE COURT:  Paragraph 43.  I'm sorry.

7         MS. WILLIAMS:  It's a range of different individuals,

8   Your Honor, including the leads of the investment bank, the CFO,

9   individuals in the investor relations department, and different

10   other groups in Citigroup.

11         THE COURT:  So it's not just the two people who have

12   agreed to pay $180,000.

13         MS. WILLIAMS:  No, Your Honor.

14         THE COURT:  And there's nothing that would stop senior

15   management from benefitting.

16         MS. WILLIAMS:  There is no evidence in our record,

17   Your Honor, that senior management had any direct pecuniary

18   benefit from the misleading disclosures.  And by that we would

19   mean did they receive a bonus because of the disclosures or some

20   compensation, some direct benefit as it's defined by the

21   statute.  And we don't have evidence of that in this case,

22   Your Honor.  If so, what we would be looking for would be

23   disgorgement from those individuals.

24         THE COURT:  They could pay a civil penalty without

25   disgorging profits.  Are you aware of what these senior

1  officials, some of them made in the year 2007?  Do you have any

2  idea what we're talking about?  The people who left?  You can

3  well imagine why they left.  It's mind-boggling.

4         MS. WILLIAMS:  I understand that they were well

5  compensated, Your Honor.

6         THE COURT:  Well compensated is the CEO and the CFO.

7  I can't figure out -- I realize that I have no authority over

8  who you prosecute and who you don't, and you've chosen to come

9  here only for Citigroup.  But for the Court to accept your

10 resolution vis-a-vis Citigroup, how can I ignore the fact that

11 senior management -- your allegations are against senior

12 management, they're not limited to two people.  And the two

13 people you're talking about walk off with a civil penalty of

14 $180,000.

15    I mean, you've had other cases, the SEC, where people paid

16 civil penalties far in excess of that.  One of these people

17 isn't even an officer or a director.  You have officers and

18 directors who are making over a hundred million dollars, who

19 leave the company coinciding with this debacle, and I don't know

20 if they're senior management or not, and then you tell me the

21 harmed shareholder who benefits from this settlement, we don't

22 know who that is.

23         MS. WILLIAMS:  Your Honor, we are --

24         THE COURT:  I don't want it to be senior management.

25 You understand that much?  There has been nothing here that is

1    being done to assure anyone that senior management who's

2    responsible, whatever level of culpability you're talking about,

3    is going to have any pain here.  And I also have to ask, who

4    this money -- I realize that 18 percent is owned by the public.

5    Where's the money coming from?  How do we know that that's not

6    important?

7              MS. WILLIAMS:  With regard to the $75 million,

8    Your Honor -- in every case where the SEC seeks a penalty

9    against a corporation, we do have to balance certain factors,

10   and we did that in this case.  And that includes the possible

11   impact on current Citigroup shareholders.  And it is possible

12   that the $75 million would in part be paid by current Citigroup

13   shareholders.  We did do an analysis and determine that in the

14   previous quarter $75 million was less than 0.3 percent of

15   Citigroup's revenue.  So the undue financial impact on current

16   Citigroup shareholders we believe would be small, whereas the

17   deterrent effect of this --

18             THE COURT:  I'm asking you about the fact that the

19   taxpayer here owns 18 percent of this company.  That was not the

20   case in Bank of America, I don't think.

21             MS. WILLIAMS:  Actually --

22             THE COURT:  Maybe it's a different kind of stock.  I

23   don't know.

24             MS. WILLIAMS:  Bank of America was a recipient of TARP

25   funds, Your Honor.  And here what we're saying is that the

$75 million, which again we determined using an estimation of
pecuniary gain, all the facts in our case, and that possible
gain occurred prior to Citigroup receiving the TARP funds and
becoming partly owned by the investors and the investing public.

THE COURT:  But is the stock that's held by the
Treasury on behalf of the taxpayer the same as in Bank of
America, or is it a different kind of stock?  The fact that they
weren't hurt back then is immaterial; if the taxpayer is paying
the SEC, what's the point of all this?  I mean, when you get
right down to it.  If it's just taking money from the right hand
and giving it to the left, I don't understand how that solves --
what have you accomplished?

MS. WILLIAMS:  Your Honor, what we would be doing is
seeking a penalty from the company.  I will admit that current
Citigroup shareholders, that may have some impact on them.  We
believe it would be extremely small based on our analysis.  And
the possible recovery by harmed Citigroup shareholders, which is
a different group, stands to be substantial from this proposed
settlement.

THE COURT:  Well, you haven't shown me a penny on
either side of this.  You understand what I'm asking you about?
The taxpayer -- because 20 percent of this company is owned by
the Treasury Department, effectively.  In Bank of America, it
was preferred stock, so they don't pay.  At least that's what
was represented to the judge.  I don't understand if that's the

1   case here or not.

2       I see no purpose in the SEC shaking a stick at a company

3   for the shareholders and getting $180,000.  I'm just baffled.

4   Why don't we hear from the company.  Maybe they can explain it

5   to me.

6       MR. KARP:  Your Honor raised a number of questions.

7   Let me try to respond to some of the particular questions and

8   then address more broadly some of the concerns that Your Honor

9   obviously has with this settlement.  One issue you raised is the

10  issue of whether senior management was involved in the misdeeds

11  alleged in the complaint.  I think part of what's going on here

12  is a misapprehension as to what this case really is about and

13  what some of the contextual allegations are that appear in this

14  complaint.

15      This case is about nondisclosure, alleged nondisclosure of

16  certain classes of assets by Citigroup during two periods of

17  time in 2007, during the July period of time and during the

18  October period of time.  It is about nondisclosure.

19      The contextual allegations in the complaint that refer at

20  various points to senior management have nothing to do with

21  alleged nondisclosure.  They have to do with valuation issues.

22  They have to do with the fact that Citigroup, early on, well

23  before the alleged nondisclosures took place, took on its books

24  and retained tens of billions of dollars of super-senior

25  positions, which were the highest-rated tranche in the CDO

```
 1        structure.  That was a business decision made by Citigroup.

 2                   THE COURT:  Where'd they take them on from?

 3                   MR. KARP:  They would market CDOs.  They would sell

 4        the tranches to various investors --

 5                   THE COURT:  Not some charitable --

 6                   MR. KARP:  No.  Citigroup was paid.  Like most firms

 7        on Wall Street that engaged in structuring activity, Citigroup

 8        was paid a fee for the creation and marketing and sale of these

 9        CDO instruments.  Citigroup had an internal decision that it was

10        going to retain the uppermost, safest tranche of the CDO

11        structure, the so-called super-senior structure, the structure

12        that is above the AAA structure in the CDO.

13             Citigroup believed, as did all other market participants

14        and regulators, that there was no material risk of loss with

15        respect to the super-senior structures.

16             There are allegations in the SEC's complaint at paragraphs

17        14 and 19 that Citigroup internally, not to the investing

18        public, but Citigroup internally, in presentations to management

19        and others within the organization, represented that in

20        determining Citigroup's exposure to subprime assets, Citigroup

21        was not going to include the super-senior holdings or the

22        liquidity puts, because they were so safe and because the risk

23        of loss was believed to be remote.

24             Now, Your Honor, there is a long story that explains what

25        happened between the middle part of 2007 and the end of 2007
```

1    when, as Your Honor rightfully pointed out, the value of these

2    instruments went from being super safe and essentially riskless

3    to collapsing.  There's an allegation in the SEC complaint that

4    addresses this issue.

5              THE COURT:  I think you want to go back to -- you were

6    saying this was a valuation of assets and not what?  What is

7    your distinction?

8              MR. KARP:  There's a difference between valuation of

9    losses associated with super-seniors and disclosure decisions.

10   This case is about disclosure decisions.  Chuck Prince, Tom

11   Maheras, Bob Rubin, others in Citigroup senior management did

12   not play any role with respect to the disclosure issues.  The

13   two individuals who the SEC determined, after two and a half

14   years of exhaustive investigation, review of 20-plus million

15   pages of documents, taking testimony from 16 individuals, the

16   two individuals who were deemed to have played a role in

17   connection with the disclosure issues, the only issues that are

18   a part of this settlement, were Gary Crittenden, the CFO --

19             THE COURT:  This is disclosure to the investing

20   public?

21             MR. KARP:  Yes, Your Honor.

22             THE COURT:  But I don't understand how senior

23   management could have questions or knowledge -- I look at

24   paragraph 43.  "They were aware that the super-senior tranches

25   were the source of the increased losses."  I don't see how the

1   distinction between valuation and disclosure makes sense.

2        MR. KARP:  You're talking right here now in paragraph

3   43 about events in October of 2007.  The super-seniors are first

4   beginning, as alleged in the SEC complaint, to absorb some

5   losses.  Minor, modest losses.  If you look at the dollars, a

6   hundred million, $300 million off of a portfolio of $43 billion.

7   Senior management continued to believe that the super-seniors

8   were safe and were not going to experience material loss and

9   would be money good.  That was the position of Citigroup senior

10  management internally.

11       THE COURT:  What's the purpose of saying senior

12  management was aware that the tranches were the source of

13  increased losses, and that they basically understated the

14  losses, the way you read this, is by about 43 billion?

15       MR. KARP:  Again, Your Honor's referring to a

16  denominator of $43 billion in assets that Citigroup believed to

17  be safe.  It was a mistaken belief.  Everyone acknowledges that.

18  Citigroup wound up losing an enormous amount of market

19  capitalization as a result of that error in judgment.

20       As Ms. Williams pointed out, there were communication

21  breakdowns throughout the bank.  There were individuals

22  responsible for disclosure, who had a certain understanding of

23  the risks associated with these instruments, and there were

24  certain individuals in other aspects of the investment bank that

25  saw creeping losses associated with these instruments.  There

1   was not a communication between the two or certainly not a sharp

2   or precise communication between the two.  That is what led to

3   the 17(a)(2) and the 13 --

4          THE COURT:  These people were the only ones that saw

5   the light?  Is that what you're telling me?

6          MR. KARP:  No, I'm saying actually two people,

7   Mr. Crittenden and Mr. Tildesley, were involved with the actual

8   disclosures which the SEC alleges to have omitted facts

9   necessary to make them not misleading.  Mr. Prince, Mr. Rubin,

10  Mr. Maheras, others in Citi senior management, were not involved

11  in the disclosure process.

12         THE COURT:  I know, but how do you think it got to the

13  point that people were making decisions regarding what was

14  disclosed and not disclosed?  You're telling me that Prince,

15  Rubin, Harris -- oh, Maheras, it's M-A-H-E-R-A-S -- Bushnell,

16  these people had nothing to do with what ultimately gets

17  communicated?

18         MR. KARP:  What wound up happening, Your Honor, and

19  it's alleged in the complaint, and the SEC's brief in support of

20  the proposed settlement makes this clear, there was a

21  communication breakdown at Citigroup.  Information that certain

22  individuals in the business understood or feared was developing

23  was not communicated to the individuals in charge of the

24  disclosure process, in this case the CFO and the head of

25  investor relations.  There was a breakdown.  As Scott Friestad,

1    in the litigation press release of the SEC, indicated --

2           THE COURT:  Why would you hold the disclosure people

3    responsible if they weren't told?  They're just fall guys then

4    under your analysis.

5           MR. KARP:  It's not that they're fall guys.  They are

6    responsible for the disclosures that the company makes.  If the

7    disclosures -- the SEC takes the position, and we do not dispute

8    the position taken by the SEC, that they had the ability to

9    discern what was going on with respect to the losses beginning

10   to be incurred with respect to the super-seniors.

11          THE COURT:  Who had the ability?

12          MR. KARP:  The disclosure individuals.

13          THE COURT:  The disclosure individuals.  But what

14   about the people who knew?  They know what's being disclosed.  I

15   don't understand.  You say it's a miscommunication.  You mean to

16   tell me -- who are the people who understood the risk?

17          MR. KARP:  Your Honor, let me approach it this way.

18          THE COURT:  Can you answer that question, sir?

19          MR. KARP:  Yeah.  The individuals who --

20          THE COURT:  Who understood the risk, that didn't

21   communicate properly?

22          MR. KARP:  I can answer the question.  The question is

23   at the time, in July of 2007 and in October of 2007, frankly,

24   very few if anyone at Citigroup understood that this was going

25   to be a major issue.  We are looking at this issue with the

1    benefit of profound hindsight analysis.

2            THE COURT:  You just changed exactly what you said.  A

3    moment ago you told me it was a miscommunication.  That means

4    group A understands X and it doesn't get communicated to group

5    B, is what I've been understanding here.  Now you're saying

6    neither A nor B understands.

7            MR. KARP:  Then I misspoke as a question of emphasis.

8    I don't want Your Honor to walk away with the impression that

9    this was an enormous deal with a loss of billions and billions

10   and billions of dollars at Citigroup at this point in time.  The

11   losses were very, very modest during the relevant period.  After

12   October 15, as the SEC alleges, there were ratings downgrades

13   that dramatically affected the security and safety and value of

14   the super-senior tranches.

15      Once Citigroup saw the ratings downgrades and realized that

16   these $43 billion in assets suddenly faced a material risk of

17   loss, it did an immediate analysis and it went to the market on

18   November 4, 2007 with an 8-K and immediately informed the

19   investing public that these --

20           THE COURT:  Why don't you step back and do this

21   chronology in a way that makes it clear.  You're saying what

22   happened before November 4.  The last time that there was any

23   statement to the investing public is when, October 15?

24           MR. KARP:  October 15, Your Honor.

25           THE COURT:  Then what happens?

1          MR. KARP:  It's laid out in paragraph 44 of the SEC's

2     complaint.  "Following the October 15, 2007 press release and

3     the October 15 earnings call, certain rating agencies downgraded

4     tranches of subprime backed CDOs.  These downgrades followed

5     earlier rating agency downgrades of certain mortgage-backed

6     securities."

7          THE COURT:  So what did your company do wrong, then?

8          MR. KARP:  We accept the fact that there was a

9     breakdown in communication and the disclosures could have been

10    clearer.

11         THE COURT:  Wait a minute.  There was a breakdown in

12    communication between whom?

13         MR. KARP:  Between the business side of Citigroup,

14    where the first cracks in the value of the subprime super-senior

15    exposures --

16         THE COURT:  When was that again?  Was it after October

17    15?

18         MR. KARP:  It was a gradual process, Your Honor.  I

19    want to be clear here.  It's not as if the value of these

20    securities fell off a cliff.  There was a very gradual and we

21    would submit modest decline in the value.  The complaint alleges

22    it was at first a hundred million dollars, then it was $300

23    million.  That was during the October time period, very late in

24    the process.  The entire disclosure case concerns disclosures

25    between July 20, 2007, and October 15, 2007, less than a

1    three-month period.

2         There was a very gradual degradation in value of the

3    super-senior securities, a tiny portion of the $43 billion that

4    Citigroup held.  After October 15, after the last disclosure at

5    issue in this case, Your Honor, rating agencies began

6    downgrading broadly entire tranches of CDOs, by the hundreds or

7    thousands.  Citigroup then realized that the $43 billion that it

8    held in these securities was now subject to material risk of

9    loss.

10         THE COURT:  I understand that.  Let's go back to

11   before the rating agencies -- we're talking about Moody's,

12   et cetera, correct?

13         MR. KARP:  Moody's, S&P, yes.

14         THE COURT:  They downgraded the tranches of the

15   subprime.

16         MR. KARP:  Yes.

17         THE COURT:  But you have continued to say it was a

18   miscommunication.  Regardless of whether we're talking about

19   43 billion or less, I'd like to understand who saw the light

20   before the 15th and how was it that it wasn't properly

21   communicated, and why are the disclosure people the ones taking

22   the fall?  It's not clear to me what you're saying.

23         MR. KARP:  Well, Your Honor, there were individuals in

24   the investment bank who, when you say saw the light, I don't

25   want to overstate this.  There were cracks in the value, there

```
 1    were signs that the value of these securities was beginning to

 2    degrade.

 3              THE COURT:  Okay.  We'll do a little

 4    cross-examination.  Who are you talking about in the investment

 5    bank?  That's what I want to know.  Who?

 6              MR. KARP:  Individuals who worked under Tom Maheras.

 7              THE COURT:  Under Tom Maheras.  Are any of them

 8    officers or directors?

 9              MR. KARP:  Not the individuals I'm speaking about.

10    There were individuals on the risk side of Citigroup.

11              THE COURT:  I read what the plaintiffs or the amicus

12    has given me.  The risk manager individual was somebody named

13    Bushnell, right?

14              MR. KARP:  The head of Citigroup global risk

15    management was David Bushnell.  There were individuals who

16    worked under Mr. Bushnell who I believe, and again, this is a

17    28-million-page record, were appearing to understand that there

18    were cracks in the value of certain of these securities.

19    Cracks.  Not --

20              THE COURT:  You keep saying cracks, but there are

21    people that made multi-fortunes investing -- betting about these

22    cracks that you're talking about.

23              MR. KARP:  John Paulson figured it out.  Citigroup,

24    Deutsche Bank, UBS, Bear Stearns did not figure it out.

25              THE COURT:  No.  Because they were making a lot of
```

```
1    money, sir.  They didn't have a whole lot of motivation to see

2    it come to an end.  The other people were investing in order to

3    make it come to an end, right?  Isn't that what it means to sell

4    short?

5              MR. KARP:  John Paulson did just fine as a result of

6    this situation.

7              THE COURT:  Therefore, let's say they saw the cracks.

8    We now have a name or two of the people that might have seen

9    something.  You're saying they didn't make the position clear

10   enough to the disclosure people?

11             MR. KARP:  That the information was not percolated

12   horizontally or vertically up the chain into the disclosure

13   silo.

14             THE COURT:  So let's just take that one step -- the

15   disclosure side or investor relations, who is this guy who's not

16   an officer.

17             MR. KARP:  Arthur Tildesley.

18             THE COURT:  He's still with the company.

19             MR. KARP:  In a different role.

20             THE COURT:  And then Crittenden.

21             MR. KARP:  That's right, Your Honor.

22             THE COURT:  Who is CFO below Prince, yes?

23             MR. KARP:  He was CFO reporting to Mr. Prince.

24             THE COURT:  And you and Paul Weiss are representing

25   the board of directors?
```

1          MR. KARP:  We, Paul Weiss, and Wachtell Lipton were

2     representing the company.  We also advised the board of

3     directors.  The board of directors had independent advice in

4     this settlement, I believe from Cravath.

5          THE COURT:  They did?  Okay.  Some of the board of

6     directors were board members back then.  There's some common

7     board of directors.

8          MR. KARP:  Yeah.  The majority of board members are

9     new and are independent.  The entire senior management team,

10    virtually the entire senior management team is new.  There's a

11    new CEO.  And I want to respond actually to one of the points

12    Your Honor made about Mr. Prince walking away with, I think

13    Your Honor said hundreds of millions of dollars.  Mr. Prince

14    didn't sell a share of Citigroup stock.  He wound up losing most

15    of his net worth.  His compensation arrangement in 2007, I

16    believe in total it was about $10 million, plus or minus.

17         THE COURT:  Well, depending on how long he held on to

18    the stock.  He got all kinds of stock options as well as --

19         MR. KARP:  He held on to the stock.  He did not sell

20    the stock, which was another question Your Honor raised.  And

21    also, while we're on the subject of officers and others in

22    senior management benefitting as a result of the $75 million

23    payment, Judge Rakoff in the Bank of America case made clear

24    that the fair funds payment was to exclude any senior officers

25    or management or directors who had any knowledge of the alleged

1    nondisclosed information.

2         So the point Your Honor rightfully raises, they cannot

3    receive any of the funds that they ought not as a matter of

4    equity be entitled to.  So that was how Judge Rakoff solved that

5    particular issue in Bank of America.

6         THE COURT:  Well, obviously, you're not going to be

7    paying these people to -- when you say -- it's your position

8    that Mr. Prince landed up with $10 million only?  You're

9    excluding stock options and the value of what his stock may be

10   worth now?  Citigroup is no longer, thanks to the Treasury

11   Department and the taxpayer, is no longer in the same position

12   as it was in 2007.

13        MR. KARP:  No.  But Citigroup has lost more than 90

14   percent of its value, and Mr. Prince has held on to his stock.

15        THE COURT:  Let's go back.  The disclosure people are

16   the people who were entering into an administrative proceeding.

17   You did not represent them, I assume?

18        MR. KARP:  Mr. Crittenden was represented by John

19   Carroll, formerly of Clifford Chance, now with Skadden Arps.

20   Mr. Tildesley was represented by Mark Stein of Simpson Thacher.

21   Your Honor also raised the question, why only $180,000.  If you

22   proceed administratively, as the SEC did, because the SEC

23   determined in its discretion that that was the most appropriate

24   way of proceeding with the charge that it believed was most

25   appropriate, the maximum penalty that can be assessed on any

1    individual I believe is $100,000, which I hope clarifies a

2    question Your Honor raised.

3         THE COURT:  It does.  There's an offer of judgment

4    that was made.  What I don't understand here is how come these

5    two people.  I just have no understanding.  And unfortunately,

6    it's quite frustrating because I have nothing to do with who are

7    the people they decide to prosecute, but I do have something to

8    do with this.  Why these two?  The explanation you just offered

9    me, if anything, absolves these two, that they're not given

10   enough clear information from the business side, and so they go

11   off and make these representations because this is what they're

12   trained or asked to do.  So that the focus is on the people who

13   can say the least in terms of culpability.  It's just

14   unbelievably baffling.

15        MR. KARP:  Let me try to approach that, and let me try

16   to approach the bewilderment that Your Honor is expressing.  At

17   the end of the day in every corporation the chief financial

18   officer I believe appropriately is responsible for the

19   disclosures that are made by the company.  The chief financial

20   officer, I would --

21        THE COURT:  Not the CEO or the board?

22        MR. KARP:  Actually, I don't believe so, Your Honor.

23   I believe the CFO is responsible for disclosures.  If the chief

24   executive officer knows that the disclosures are inaccurate, of

25   course, of course there would be culpability or liability.  But

1    there's no allegation in this case that Mr. Prince or Mr. Rubin

2    or any other board member knew that the disclosures being made

3    in July and October of 2007 were in any way misleading or in any

4    way failed to include all relevant, material information.

5        This was the contextual point I tried to raise with

6    Your Honor a couple of moments ago but I never got out.  Let me

7    try again.

8        This entire mess, and I think "mess" is the term that best

9    characterizes what happened here, to Citigroup and to other

10   firms across Wall Street, is being looked at today with a

11   profound hindsight bias.

12           THE COURT:  Sure.

13           MR. KARP:  But if I can go on, I don't believe -- and

14   you're seeing this in ruling after ruling after ruling in the

15   district courts in the Southern District of New York, when

16   private 10b-5 plaintiffs are asserting 10b-5 claims seeking to

17   hold company after company after company responsible for these

18   dramatic losses in the subprime space, district judge after

19   district judge after district judge say, wait a second.  I

20   understand the losses were gargantuan, but the federal

21   securities laws require that plaintiffs, in order to establish

22   fraud, need to make a showing of a strong inference of scienter.

23           THE COURT:  There's no charge of fraud here.  This

24   isn't a 10b-5.  I understand that.

25           MR. KARP:  But I'm trying to explain the context and

1    the hindsight bias.  You're looking at this like most people

2    appropriately look at this and say you have $43 billion of

3    securities that essentially blew up.  How could people not have

4    known about that?  How could this not have been disclosed?  And

5    what I'm trying to communicate is that the collapse in the

6    financial markets, and in particular the collapse of these

7    particular securities, which were rated above AAA, caught

8    everyone off guard and flat-footed.

9        Everyone missed it.  Maybe John Paulson figured it out, but

10   he was in a very, very small minority.  Citigroup didn't figure

11   it out.  Citigroup's management didn't figure it out.  If

12   Citigroup's management knew these instruments were going to blow

13   up and lose much of their value in the fourth quarter of 2007,

14   it would have been ludicrous for Citi to hold on to tens of

15   billions of dollars of these securities.

16       THE COURT:  What could they have done with them at

17   that point?

18       MR. KARP:  They could have tried to hedge them.  They

19   could have tried to sell them for discounts.  They could have

20   tried other mechanisms of unloading them.  Other firms figured

21   some of this out earlier.  But that's a breakdown of management.

22   That's not a violation of the securities laws.

23       THE COURT:  But your company, your client is entering

24   into at least a nondisclosure, 17(a) and 13(a) of the securities

25   law, violation.

1          MR. KARP:  Yes, Your Honor.

2          THE COURT:  Nobody's taking the position, or they

3    couldn't possibly be taking the position that nobody had any

4    clue, and therefore everybody was just in a big surprise,

5    because even, there are some people -- you call it a crack, but

6    there are some people at least who had a clue.  Not the

7    investing public, but there were some people who had a clue

8    about what was going on in the company.  You've already said

9    that.  So you're swimming upstream.

10          MR. KARP:  But Your Honor, Citigroup is settling

11   charges under 17(a)(2) that it failed to include all material

12   information in certain earnings-related disclosures, and it is

13   also settling charges under 13(a), in particular 12(b)(20) and

14   13(a)(11) of the Exchange Act, in that certain of its public

15   disclosures were not accurate based on all of the relevant

16   circumstances.

17          THE COURT:  Does that include 8-Ks or only these

18   calls?

19          MR. KARP:  It includes both.

20          THE COURT:  It includes filings with the SEC?

21          MR. KARP:  It does, Your Honor.

22          THE COURT:  And do you know from all your work on

23   behalf of Citigroup how many people bought during, let's call it

24   this inflated period?  And we'll just limit it to '07.  July to

25   November.

1          MR. KARP:  I don't have that information, Your Honor.

2     But those would be the individuals presumably -- and this is

3     again what Judge Rakoff did in BofA.  He wound up approving the

4     SEC's proposed plan of distribution in July of 2010, after

5     approving the settlement five months earlier, I believe.  So he

6     allowed the SEC to present to Your Honor a plan of distribution

7     that from a principled perspective would make whole or attempt

8     to make whole any investors who suffered losses as a result of

9     the alleged misconduct.

10          THE COURT:  Wouldn't you feel far more comfortable

11     approving something if you knew there had only been a hundred,

12     let's say $80 million of purchases during that period of time?

13          MR. KARP:  Your Honor, again, when you look at the

14     potential pool of victims, Citigroup's shareholders are

15     asserting a 10b-5 class action, and Citigroup's bondholders are

16     filing, or there's pending a 10b-5 bondholder class action

17     before Judge Stein in the Southern District of New York.  So

18     this SEC settlement is just one piece of the potential avenues

19     of redress for these individuals.

20          THE COURT:  Right.  But I'm trying to understand what

21     guideposts I get to use here.  I don't get to say, well, how

22     come these people on the investment side aren't standing in

23     front of me, because they can choose whether to prosecute, based

24     on whatever they determined, they can decide to put them in an

25     administrative proceeding.  And then I have to say, well, is $75

1   million -- I have absolutely no guideposts.

2            MR. KARP:  Let me try to provide some --

3            THE COURT:  Why did Bank of America go with 150

4   million?

5            MR. KARP:  I was brought into that case, and I'll give

6   you some insights.  There have been a series of recent SEC

7   settlements involving credit crisis related nondisclosures.  On

8   one end of the spectrum is the Wachovia settlement at $37

9   million.  At the other end of the spectrum is the Goldman Sachs

10  settlement at $550 million, which was recently approved by Judge

11  Jones in the Southern District.  Bank of America came in at $150

12  million.

13       The facts in each are different.  The SEC, however, was the

14  enforcement authority that brought all four of these cases.  The

15  SEC in this case, again, spent two and a half years

16  investigating, I don't want to go through the litany, but spent

17  an enormous amount of time, reviewed an enormous amount of

18  documentation, took an enormous amount of witness testimony, and

19  made the determination that Citigroup's conduct in this case

20  merited a $75 million penalty.  More than Wachovia, less than

21  Bank of America, substantially less than Goldman Sachs.

22       The SEC, I believe --

23            THE COURT:  Goldman Sachs was clearly different.

24            MR. KARP:  I agree with you.

25            THE COURT:  That was not an investment -- statements

1    or nondisclosure --

2            MR. KARP:  That was different.  That was two

3    particular investors.  That was a different case and that was

4    under 17(a)(1), 17(a)(2), and 17(a)(3).  And that was

5    scienter-based, that settlement.

6        But again, Your Honor, the point I'm trying to emphasize,

7    you're mentioning you're looking for guideposts.  What I'm

8    suggesting is that the SEC has been bringing a series of

9    nondisclosure related enforcement actions relating to credit

10   crisis related nondisclosures.  And the SEC, I believe, and I

11   would submit respectfully, Your Honor, is in the best position

12   to assess where on the totem pole of relative culpability each

13   of these actions falls.

14       And I don't believe there's anything in this record, with

15   all respect, that would suggest that the SEC's determination

16   that a $75 million penalty in a case that the SEC describes in

17   its brief at page 2 as representing a breakdown in

18   communications is unreasonable.

19           THE COURT:  I suppose, except it's a leap of blind

20   faith, based on what they tell you in this pleading.  I have no

21   way of knowing what's the difference between Bank of America and

22   this or Wachovia.

23           MR. KARP:  Well, Your Honor, you raise an interesting

24   point.  That is obviously an institutional issue that Judge

25   Rakoff brought to the fore in September.

1          THE COURT:  We looked at one of the cases that was

2     cited by the SEC, and the individual paid a million-dollar civil

3     penalty in a case called Biovail.  I have no idea, but it's not

4     a 10b-5 action, that's for sure.

5          MR. KARP:  And I presume, Your Honor, that it wasn't

6     an administrative proceeding either.

7          THE COURT:  Of course not.  As you just told me,

8     there's a cap.  But it does raise a question.  Well, I think

9     that we've gone -- exhausted both sides.  Since there's not both

10    sides here, it's very frustrating.  I'm going to listen to the

11    amicus.  Whether I grant this or not, I want to hear what they

12    have to say.

13         Otherwise, I have now today this lengthy detailed complaint

14    that goes on for pages and pages and pages, and I'm now told it

15    sort of constitutes a miscommunication, and I'm left with the

16    distinct impression that the two people -- you're saying this

17    man is strictly liable for the disclosures because he's CFO.  I

18    don't know that that's the law, but that's basically what you're

19    saying.

20         MR. KARP:  No, I don't think that's what I was saying.

21    I was saying he is responsible for the disclosure process, and

22    if there were not appropriate mechanisms in place at the time to

23    collect information from all corners of the corporation, the SEC

24    made a determination, which I think is entitled to substantial

25    deference, that he ought to be held responsible for causing a

1    violation of Section 13(a) of the Exchange Act.  That's what I'm

2    saying.  I'm not suggesting it's strict liability.

3              THE COURT:  Well, it's getting close to it, because

4    when you're talking about from all corners of the corporation,

5    I'm not looking at 23 million documents for sure, but I cannot

6    in good faith believe that they didn't get the word from the

7    business people that this is a shaky asset at some point before

8    October 14.  It's unbelievable to think that some people saw,

9    quote, cracks, and you're saying he didn't go around to the

10   necessary corners.

11       We're talking about two major parts of this company, the

12   investment and the risk management.  They're not hidden little

13   corners.

14             MR. KARP:  And again, to be fair to the SEC, and

15   again, we accept, we don't admit nor deny the allegations in the

16   complaint.  There are allegations in this complaint that

17   indicate that Mr. Crittenden was presented decks during the fall

18   period in which, if you evaluated all of the information in the

19   decks, would have enabled him to determine that there were

20   certain weaknesses in the subprime super-senior space.  Not

21   large weaknesses, cracks, had he picked up on that.

22       He didn't pick up on it.  Had he picked up on it and had he

23   known, Your Honor, that the super-seniors presented a material

24   risk of loss, and had he not disclosed that and had he

25   supervised the transmission of a materially false disclosure,

1    knowing that there were errors in the disclosure, I don't think

2    this would be a 17(a)(2) breakdown in communications case.  It

3    would be a different case and the sanction would be more severe.

4    That's the line I think we're trying to get at here.

5            THE COURT:  Rather thin.

6            MR. KARP:  I think most cases are rather thin.

7            THE COURT:  Okay.  I do want to hear from the

8    shareholders.  They're obviously a shareholder.  They don't see

9    it the way you do.  I might as well hear from them.

10           MR. KARP:  Your Honor, could I reserve a couple of

11   moments to respond?

12           THE COURT:  I'm going to have some briefing here.  I

13   have more questions than you can possibly answer.

14           MR. KARP:  Could I then ask if you would indulge me

15   for just one moment, if you would.

16           THE COURT:  You can speak at the end.  All right.

17   Let's hear from Mr. Lerner's lawyer for a minute.  I don't know

18   how I can go without listening to people that have different

19   points of view.  I'm not here to litigate your case, nor am I

20   going to be used to help your case one way or another, frankly.

21   I mean, that's not my job.  My job is to look at this settlement

22   and see whether it's fair and figure out who's going to get the

23   money and where it's coming from.  Questions that have still not

24   been entirely answered.

25       In any case, I don't have any objection to -- I've read

1   your pleadings.  I'm not reading 500 pages of attachments.

2   That's not fair.  And don't -- and I say this to everybody, I do

3   not accept letters.  I practiced in a private firm and I was in

4   the Southern District and it's a practice that does not exist

5   anywhere else, for good reason.

6           MR. MILLER:  Your Honor, first we'd like to thank you

7   for having this hearing in the first place, rather than just

8   considering the submissions by the parties in the papers, and in

9   particular for allowing us to state our views on the record

10  today.

11         First and foremost, it appears that the Court has already

12  come to this conclusion.  The Court needs a more complete record

13  in order to evaluate the proposed judgment submitted by the

14  parties.

15         We submit that the SEC and Citigroup should put together a

16  record that includes documentation sufficient to support the

17  conclusion of the SEC that this is an appropriate judgment.

18  That does not necessarily mean all 28 million documents or

19  however many documents were submitted to the SEC or reviewed by

20  the SEC, but at least a reasonable subset of those documents to

21  enable the Court to make an informed judgment.

22         We would also request to be permitted to review those

23  documents and would certainly assent to any reasonable

24  protective order proposed by the parties.

25         THE COURT:  Have you had discovery in your case or in

1       the case in front of Judge Stein?  That's not your case.  You're

2       in the state court.

3               MR. MILLER:  That's right.  We're in the state court.

4               THE COURT:  Have you had discovery?

5               MR. MILLER:  We have not.  Procedurally we're still

6       fairly early in our case, and ours is a derivative case in which

7       discovery is typically not awarded in the early stages.  So we

8       have not had discovery at this point.

9               THE COURT:  You can't make a case and neither can your

10      case in the federal court based on the *New York Times*, I

11      suspect.

12              MR. MILLER:  Well, there's a fair amount in the

13      *New York Times*, and from the *New York Times* as well as many

14      other sources, we believe we have stated actionable claims, as

15      well as we have pleaded that the company has wrongfully refused

16      our demand on the board.  But that's a matter for the court in

17      New York in any event.

18              THE COURT:  Do you usually get -- if they submit

19      documents, since when -- would they not be public anyways?  You

20      can look at a public record like anything else.

21              MR. MILLER:  Absolutely.  And we would certainly

22      encourage the parties to submit them on the public record and

23      for the Court to keep that record public.  In the event it were

24      not public or portions of it were not, we would assent to be

25      parties to any protective order that were entered.

1          THE COURT:  Your position is you want to know more

2     about what happened here, basically?

3          MR. MILLER:  That's our first position.  We would like

4     to know more, both for our benefit, and more importantly for the

5     Court's benefit, in order to make a more informed evaluation of

6     the proposed judgment.

7          But beyond that, based on what is in the record, our

8     principal concern is that this judgment does not punish the

9     proper party.  And I use the word "punish" because the principal

10    purpose of a civil penalty -- and many courts have addressed

11    this -- the principal purposes are, number one, to punish the

12    wrongdoer, and number two, to deter others from engaging in

13    similar wrongdoing.

14         THE COURT:  Now, if I take that argument to its

15    logical conclusion, and I have no power over who they name or

16    don't name or where they name them, your argument would say,

17    tell Citigroup they don't have to pay the 75 million and call it

18    a day.  I have no ability to have them name the people you've

19    named.  It's not my job.  I can only accept or reject what's

20    before me.

21         So under your analysis, if you make that position clear or

22    if you take your position to the logical conclusion, I should

23    reject anything that comes out of the shareholders', indirectly

24    or directly, their pockets.

25         MR. MILLER:  That's correct, Your Honor.  We represent

1     a current and long-term shareholder of the company, and our

2     client's position is that the company is a victim every bit as

3     much as any other person.  This company has lost $50 billion, as

4     conceded by counsel for the Citigroup, and as pleaded by the SEC

5     in its complaint.

6          It is akin to asking a victim who was run over by a bus to

7     pay the speeding ticket for the bus driver.  Citigroup is the

8     victim here.  The perpetrators were individual persons.

9              THE COURT:  That's for you, though.  It can't be for

10    me.  I don't have the power over the individuals.  So I don't

11    understand what you expect the Court can do.  What would you ask

12    the Court to do, reject this settlement?

13             MR. MILLER:  Yes, Your Honor.  But the Court does have

14    the ability to influence the parties, to at least consider the

15    possibility of naming natural persons as defendants in this

16    proceeding and exacting something more than a $100,000 penalty

17    such as the one that was imposed on Mr. Crittenden.

18             THE COURT:  Let's assume they took the most culpable

19    people.  Let's assume it.  It's too late for me.  They're out.

20    They bought their piece for a paltry sum.  I don't understand --

21    actually, you're supposed to be assisting the Court.  How can

22    you assist the Court if you're telling me that I should reject

23    this and hope they come in here with some other people with

24    deeper pockets, I guess?

25             MR. MILLER:  Your Honor can influence the parties to

1    move in that direction.  We recognize that Your Honor cannot

2    modify an agreed-to judgment.  Your Honor can only accept it or

3    reject it and then proceed to adjudicate the case.  And we would

4    submit that on the present record, if your only options were to

5    accept or reject the settlement, it should be rejected.  It

6    punishes the wrong party.  It punishes a victim.  It would be a

7    different story if the most culpable individuals were in this

8    proceeding.

9           THE COURT:  You don't know who they are either?

10          MR. MILLER:  Well, we certainly have a suspicion as to

11   who they are.

12          THE COURT:  You haven't had the discovery the SEC's

13   had.  You haven't reviewed 28 million documents.

14          MR. MILLER:  That's correct.  We've not had the

15   benefit of --

16          THE COURT:  All right.  Go ahead.  Finish up, please,

17   sir.

18          MR. MILLER:  Even having the benefit of information

19   that's in the public record, it's apparent to us that this is a

20   company that warehoused tens of billions of dollars in CDOs and

21   analogous instruments over a two- to three-year period, and we

22   have alleged that they did so for the express purpose of

23   generating short-term investment banking income.  Tommy Maheras,

24   the senior investment banker who oversaw this whole process,

25   pocketed as much as $30 million in one year alone.

1    Beyond the investment bankers, there are others who

2   profited from the profitability, or the alleged profitability of

3   the company.  I was surprised to hear Mr. Karp represent that

4   Mr. Prince held all of his stock.  We have different

5   information.  We have information that he sold $17 million worth

6   of stock between 2005 and 2007, including $3.4 million of stock

7   during the narrow period in 2007 at issue in this proceeding.

8   Mr. Rubin sold $28 million worth of stock between 2005 and 2007.

9   And this is in addition to their compensation packages.

10           THE COURT:  Where do you get your information?

11           MR. MILLER:  Well, most immediately from our

12   complaint, and previously -- I couldn't tell you the precise

13   online source, but we could certainly make a supplemental

14   submission, as I'm sure the other parties could, and we could

15   clarify that issue.

16           THE COURT:  All right.  I need to address the SEC

17   about a few things, because I don't know what kind of

18   information is available or not available and whether it's

19   private or public.  They certainly have made it clear to

20   everybody that I don't have sufficient information to go

21   forward.  I have no guideposts whatsoever.  Ms. Williams, may I

22   address you?  Thank you.

23           MR. MILLER:  Thank you.

24           THE COURT:  The parties can file oppositions to the

25   motions on behalf of Mr. Lerner.  Is it Mr. Lerner is the

1    stockholder?

2              MR. MILLER:  Yes, Your Honor.

3              THE COURT:  Counsel says he wants to know more.  Well,

4    I want to know more.  Is your investigatory materials not

5    public?

6              MS. WILLIAMS:  My understanding is that right now they

7    are nonpublic, Your Honor.  But now that we have filed this

8    action, generally speaking when we file an action, the

9    investigative record, the part that is not privileged, is

10   something that we turn over with initial disclosures to the

11   other side.  So in this case I don't see why that would be any

12   different, i.e., if we need to support --

13             THE COURT:  You do.

14             MS. WILLIAMS:  I did want to address a couple of

15   points Your Honor had raised.

16             THE COURT:  Sure.

17             MS. WILLIAMS:  Specifically with regard to the

18   undertakings with the individuals, the SEC is statutorily

19   confined as to what we can receive as far as penalties from

20   individuals.  And it's very different from the penalties we can

21   seek from corporations.  Under the statute, we can seek,

22   depending on the time period, and for this time period I believe

23   it's $6,500 per violation from individuals.  And from

24   corporations, that jumps up to -- and this is just for first

25   tier violations -- $75,000 per violation.  So it's a significant

1    difference in how those penalties are calculated.

2        Here, if we had brought fraud actions in court against

3    individuals, we would not be able to recover anywhere near

4    $75 million from those individuals, because we again are

5    constrained with how we calculate penalties on individuals.  The

6    $100,000 and $80,000 undertakings in this case were supported by

7    the record, and we believe were quite substantial based on the

8    evidence that we had.

9            THE COURT:  I don't understand.  You're saying per

10   violation.  What does it mean, per violation?

11           MS. WILLIAMS:  Depending on the case, we define

12   violations differently.  Here you could define the violation per

13   disclosure.  You could define the violation as to how many

14   shareholders received copies of a registration statement and

15   prospectus that incorporated some of the false statements.  We

16   did examine all of those issues in determining the penalties in

17   this case.

18           THE COURT:  You indicate you've done both a thorough

19   investigation, an economic analysis, compared it to other cases,

20   but none of this has been shared with me.  I have a pleading

21   here of 16 pages.  You say that it's comparable and it fits in

22   with other cases.  You say that you did a two-year

23   investigation.  I have no facts.  You talk about senior

24   management.  You don't tell me who they are.  I'm not clear for

25   a minute.

1       You say that there's certain -- "Citigroup's internal

2   documents provided to senior management and investment relations

3   personnel show that the investment bank had substantially more

4   than 13 billion in subprime exposure," and the company's public

5   disclosures were inconsistent.

6       Well, I don't see that statement as being some kind of

7   failure to communicate clearly enough.  That says a lot more to

8   me.  I don't know, because I haven't seen the backup.

9           MS. WILLIAMS:  We also say in the complaint that there

10  were other internal documents where the super-seniors and

11  liquidity puts were not included in the subprime exposure, and

12  that there were meetings with senior management in which the

13  subprime exposure was characterized as being 12 to $13 billion.

14      So when looked at as a whole, what we tried to set forth,

15  and perhaps didn't do so as well as Your Honor would have liked,

16  is that there were conflicting sets of documents at Citigroup,

17  and ultimately the two individuals we brought the administrative

18  proceedings against, Mr. Crittenden, who spoke on the investor

19  calls, actually made the misleading disclosures and helped to

20  draft and approve the disclosures -- all of those actions

21  contributed to our deciding that the facts and evidence

22  supported an administrative proceeding against him.  As well as

23  Mr. Tildesley helped to actually draft the disclosures and

24  approve the disclosures.

25          THE COURT:  Wouldn't you, if you're sitting where I am

1    and you read this, and you say that the internal documents

2    provided to Citigroup's senior management, who wrote the

3    internal documents?  Who were the senior management and

4    investment relations personnel?  Who are we talking about?  Are

5    we talking only about two individuals?  Obviously not.

6        You can't have it every which way.  I mean, yes, maybe

7    somebody else had an inconsistent view.  I doubt very much the

8    same people -- one person had an inconsistent view of these

9    things.  Somebody here is saying things, which means that

10   Mr. Crittenden knows that there's some substantial issue.

11            MS. WILLIAMS:  Actually, Your Honor, what we are

12   alleging is there was a breakdown in communication in getting

13   the information into the disclosures.  So, while there were

14   documents made available, they were conflicting, and the people

15   who ended up being ultimately in charge of the disclosures did

16   not include information that we believe should have been

17   included in the disclosures.  The disclosures were misleading.

18            THE COURT:  What should have been included?  That we

19   don't know what our exposure is because we have conflicting

20   views?

21            MS. WILLIAMS:  No.  That the super-seniors and

22   liquidity puts were part of subprime exposure and should have

23   been included as part of the subprime exposure.

24            THE COURT:  Well, how are we supposed to know that

25   that's what they should have done?

1          MS. WILLIAMS:  We allege that in our complaint,

2     Your Honor.

3          THE COURT:  I know.  But when you stand up here and

4     you say there's a miscommunication, that there were internal

5     inconsistencies, and so why are they held to a standard that you

6     say they should have disclosed, and then you say, well, we're

7     going to excuse the people who were communicating because they

8     were either misinformed or they communicated not clearly enough.

9     Your position is hardly persuasive in terms of internal

10    consistency.

11         MS. WILLIAMS:  Your Honor, we brought this action

12    against Citigroup because we believe that these internal

13    documents and the process in which the disclosures were crafted

14    was a company process that broke down, and it's the company

15    ultimately that is responsible, in addition to the fact that our

16    analysis shows the company had some pecuniary gain.

17         In order to recoup that and distribute money to harmed

18    shareholders, we in our discretion determined it was appropriate

19    to bring this action against the company.

20         THE COURT:  Well, I assume that it's appropriate.

21    Exactly why, I don't know at the moment.  And I'll give you a

22    chance to set it out.  I have to understand a couple of basic

23    things.  I don't know what the facts are here.

24         We read your complaint and the first thing that becomes

25    apparent, or the impression that it creates, is that these

people knew or should have known that their disclosures were

false and misleading by admitting substantial assets that

everybody, or a substantial number of people in senior

management in the investment side knew about.  And I sit here

and ask who, and I get very little in the way of clear answers.

It takes a long time to get a straight answer from either that

side on behalf of Citigroup or the SEC.

So I have to see what it is that caused you to come up with

this solution.  You say it's reasonable in view of other cases.

I don't know why or how.  When I look at one of the cases you

cite, I see an individual paying a million-dollar civil penalty

and one dollar of disgorgement.  So he couldn't have made a lot

of money.  And he's permanently enjoined under 13(d).  I see

nothing that he was charged under fraud, but I don't know.  They

said that the fraud charges against Melnyk remain pending.

So in any case, I understand my discretion is limited.  I'm

not here to serve as a tool of the plaintiffs' bar, that's for

sure.  I am here to try to figure out why we have what we have.

You've focused on two individuals.  I can't for the life of me

figure out why.  I really can't.

MS. WILLIAMS:  They were in charge of drafting and

approving the disclosures, and our case is about the false and

misleading disclosures.

THE COURT:  I know, but they could only be culpable if

they knew about those disclosures.  So I want to understand why

1   that side of the fence is the side of the fence that caused

2   this.  If I told you X and X is false, and I know it's false and

3   you don't know anything except you're responsible for the

4   disclosures, you're not liable; I am.

5           MS. WILLIAMS:  That's actually not what occurred,

6   Your Honor.

7           THE COURT:  Okay.  But I don't know what occurred.

8   That's the problem.  You expect courts to rubber-stamp, but you

9   can't.  You don't tell us.  You come up with 75 million.  I'm

10  very sympathetic to Judge Rakoff.  He looked at the same thing

11  presented by the SEC.  Had not the foggiest idea.  I mean, I

12  read the transcripts.  Why?  What were you telling him?  And

13  nobody said.  And you would think that after Bank of America the

14  SEC ought to learn that if you want somebody to think it's fair

15  and reasonable, you have to put it in context.  And I think you

16  ought to split it up with the other side, frankly.  You

17  shouldn't do all the work here.

18      I can't be happy unless I know who's senior management,

19  what are the facts, what did happen here in your view.  It's

20  obvious you don't think there was fraud.  Miscommunication is

21  silly.  You can't tell me they would impose 75 million on a

22  company because somebody didn't talk well enough.  That can't be

23  right.  That can't be your case, miscommunication.  That's a

24  defense, not an affirmative case.

25      They'd come in here and do what I just did, to say well, if

1    I'm Mr. Crittenden and I didn't know any better, because nobody

2    told me, because I'm not the person valuating these assets.  So

3    I want to understand what happened, and I want to know who

4    you're talking about in your various paragraphs about senior

5    management.  Who knew what when, is what we're looking for.  And

6    why is 75 million fair?  How does it compare to other cases?

7         You have these financial penalties, 2006.  I don't know

8    what the harm is to the investor, I don't know what the

9    pervasiveness is.  I don't know what the scienter is.  So far,

10   miscommunication is the scienter.  I want to know how the fair

11   fund will work here.  Who pays?

12        MS. WILLIAMS:  Your Honor, all of the distribution

13   costs would be paid by Citigroup, separate and apart from the

14   $75 million.  So Citigroup will be paying for all of the

15   distribution cost.

16        THE COURT:  No, I don't mean that.  I understand.  I

17   mean the 75 million.  Is it going to be the American taxpayer,

18   who owns 20 percent of this company?  Imagine how that looks.

19   Taxpayer pays the SEC.  There has to be a response to that.

20   There was in Bank of America.  I don't know what it is here.

21   Who's going to get this money and how am I going to make sure it

22   doesn't include the people who did make money from Citigroup at

23   the expense of the shareholders?  I don't care what the scienter

24   level is.

25        I've got a list of people that made tremendous money, and

1    maybe they would have made more had people been a little more

2    astute.  But I look at the directors, the officers, what their

3    compensation packages were.  Am I approving a settlement that's

4    going to put money in their pockets?

5           MS. WILLIAMS:  No, Your Honor, because the

6    distribution plan and who is going to get money and how much

7    money they're going to get is something that the SEC in our

8    judgment says we would propose a plan at a later date for

9    Your Honor, and that would be something that you would need to

10   approve.

11          THE COURT:  I'd like to know who would be excluded

12   from the plan.  And I want to know what the definition of a

13   harmed shareholder is.  Is it somebody who bought stock in that

14   three months?  I'm very troubled by the fact you've got two

15   individuals, one guy's not even an officer or director, paying

16   this and no one else, even though I suspect when I look at the

17   documents the people who saw the light or the cracks are not

18   going to be these two people.

19       So I'd like to see between the two parties here what is the

20   case to be made for taking this settlement as is.  I don't think

21   it's a helpful suggestion from the amicus to tell me I should

22   just reject the settlement and have nothing.  If the SEC -- you

23   know, you don't know whether the SEC doesn't have the resources

24   to prosecute a case like this against individuals.  I have no

25   idea.  But there ought to be some reasons why two people, one of

1    whom is pretty low on the totem pole, compared to the people on

2    the investment side who have been identified here today,

3    reluctantly by the counsel.

4         You have a situation -- it doesn't take a great deal of

5    insight -- in which the board of directors includes some of the

6    very people who were board of directors before.  This isn't

7    without conflict.  It's rife with conflict of interest.  And

8    you're the only sort of public entity here that's supposed to

9    stand between the public and what goes on on Wall Street.  And

10   I'm not convinced you've done a very thorough job convincing me.

11        I don't know if you're all convinced so well, but it

12   does -- if the best you can come up with is the stockholder pays

13   the stockholder, you can save everybody a lot of money down the

14   road, and the taxpayer a lot of money, and skip it.  I mean, two

15   and a half years investigation, and the stockholder pays the

16   stockholder.  I find that remarkably inefficient use of taxpayer

17   dollars.

18        So I hope you can convince me that this is a more useful

19   expenditure by the SEC.  If they don't go after individuals like

20   they say they will, and they promise they will and they say

21   that -- you said to the judge in New York that it's your policy

22   to go after them, but here -- in that case you didn't have all

23   the information because they stonewalled you with

24   attorney-client privilege.

25        Either you have a good case or you don't have a good case.

1    But this kind of, well, there's a miscommunication, is a pretty

2    unimpressive way of -- what happens if the case -- if I don't

3    accept this and you prosecute them?  They have the defense in

4    their back pocket.  You can't prosecute a case on the basis of a

5    miscommunication.  You have to have people be responsible for

6    something that violates the law.

7            MS. WILLIAMS:  Your Honor, I think what we said was

8    there was a breakdown in communication with regard to the

9    disclosure process.  I don't want to give Your Honor the

10   impression that we feel this is a miscommunication case.  This

11   is a negligence case.  What we're saying is, in the disclosure

12   process that was set up in order to make sure the disclosures

13   were full and accurate, the communications that needed to be

14   provided to those people who were drafting and who were

15   approving and making the disclosures, that communication was not

16   provided to them in a clear and effective manner so that the

17   disclosures could be accurate.  That process breakdown we

18   believe is negligence, which is why we brought the 17(a) claim.

19   It's not just a miscommunication case.

20           THE COURT:  Okay.  Show me that it's negligence.  Show

21   me it's not fraud.  Show me it's not miscommunication.  Show me

22   you've got a case.

23           MS. WILLIAMS:  We do believe it's fraud.  It's just

24   nonscienter fraud.  Under 17(a) it's fraud.

25           THE COURT:  It's just a fraud on the consumer, you

1    mean, but it's not a fraud by the perpetrators.

2              MS. WILLIAMS:  No, Your Honor.  We believe it's fraud

3    by the perpetrators.  It's just nonscienter fraud.  It's knew or

4    should have known, not knowledge or recklessness.

5              THE COURT:  Is nonscienter -- you'll have to excuse

6    me -- is that not a 10b-5 violation?

7              MS. WILLIAMS:  No, Your Honor.  Under 17(a)(2) it's a

8    negligence standard.

9              THE COURT:  But are you saying that a fraud claim has

10   to be scienter against an individual?

11             MS. WILLIAMS:  No, we're not -- well, let me think for

12   a minute.  You can bring a 17(a) claim against an individual.

13   Yes, you can bring a claim for nonscienter fraud against an

14   individual.  We did not believe the facts substantiated doing

15   that in this case.

16             THE COURT:  Well, I look forward to understanding this

17   a little better.  You're welcome to supplement or -- you have as

18   much at stake here as they do in a lot of ways.  And I'm not

19   clear on -- when can we have something that addresses -- as I

20   say, I'd like to know the facts, why you claim that this is a

21   negligence case, not a fraud case in the 10b-5 sense, but more

22   than a miscommunication.  Who are the senior management people

23   that are being referred to, and who communicated or didn't

24   communicate with whom.  Why is the 75 million fair and

25   reasonable, and how do you compare it and how do you apply your

1   penalties.  I don't know what your economic analysis showed at

2   all.  I have no idea.

3        And then I'm interested in knowing more about how you

4   expect this fair fund to work, and why are we only dealing with

5   two individuals.  We're not dealing with them.  Why are there

6   only two individuals?  Why have other people not been involved

7   here?

8        And I suppose it would be wise if you would also as the

9   last thing besides facts, the 75 million, the fair fund,

10  individual possibilities, do you have any response to the amicus

11  sets up nonmonetary suggestions?  I have no idea whether any of

12  them have any merit from the SEC's point of view.

13       Can you do this by shortly after Labor Day, and we'll have

14  another hearing thereafter?  Both sides, if people want to

15  file -- why don't we have the SEC file first and they can

16  supplement.  Labor Day is the 6th.  Can you do something,

17  Ms. Williams, by the 8th?

18            MS. WILLIAMS:  Yes, Your Honor.

19            THE COURT:  If you have anything to add, I'd ask you

20  to do it by the 13th and we'll set another hearing.

21            MR. KARP:  Of course, Your Honor.

22            THE COURT:  I think we should set a hearing for the

23  24th of September.  11:00, is that all right?  And you can file

24  your oppositions to the amicus.  I regret to say the papers were

25  better than the argument, sir, because you didn't give me

1    anything to help me.  I learned everything I learned in the

2    papers.  You can't just tell me to sandbag this because they

3    haven't prosecuted the right people.  That's the difficulty.

4        Okay.  You'll file your timely opposition to the amicus

5    motion, and the SEC will file on the 8th, and what day for the

6    Citigroup?

7            MR. KARP:  13th, Your Honor.

8            THE COURT:  And we'll be back the following Friday at

9    11, the 24th.  Thank you.

10       (Proceedings adjourned at 3:33 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE