```
 1                    UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
 2     --------------------------X

 3     SECURITIES and EXCHANGE COMMISSION,

 4              Plaintiff

 5                  v.                    Civil Action No. 10-1277

 6     CITIGROUP,

 7              Defendant

 8     --------------------------X       Washington, D.C.
                                         Friday, September 24, 2010
 9                                       11:22 A.M.

10                      TRANSCRIPT OF HEARING
               BEFORE THE HONORABLE ELLEN SEGAL HUVELLE
11                 UNITED STATES DISTRICT JUDGE

12     APPEARANCES:

13     For the Plaintiff:  Erica Y. Williams, Asst. Chief Litigator
                           Scott W. Friestad, Assoc. Director
14                         SECURITY and EXCHANGE COMMISSION
                           DIVISION of ENFORCEMENT
15                         100 F Street, N.E.
                           Washington, DC 20549-4010
16                         (202) 551-4450

17     For the Defendant:  Brad S. Karp, Esq.
                           Susanna M. Buergel, Esq.
18                         Charles E. Davidow, Esq.
                           PAUL, WEISS, RIFKIND,
19                             WHARTON & GARRISON, LLP
                           2001 K Street, NW
20                         Washington, DC 20004
                           (202) 223-7380

21

22     Court Reporter:            Lisa Walker Griffith, RPR
                                  U.S. District Courthouse
23                                Room 6507
                                  Washington, D.C.  20001
24                                (202) 354-3247

25     Proceedings recorded by mechanical stenography, transcript
        produced by computer.
```

1                    **P R O C E E D I N G S**

2           THE DEPUTY CLERK:  This is civil action 10-1277.

3     Security Exchange Commission versus Citigroup Inc.

4           Will all counsel please approach the podium and

5     identify yourself for the record please.

6           MS. WILLIAMS:  Good morning, Your Honor.  Erica

7     Williams from the Securities and Exchange Commission.  Along

8     with me is Scott Friestad also from the Commission.

9           THE COURT:  Good morning.

10          MR. KARP:  Good morning, Your Honor.  Brad Karp from

11    Paul, Weiss on behalf of defendant Citigroup.  With me today

12    are my partners, Susanna Buergel and Charles Davidow also

13    from Paul, Weiss; Lawrence Pedowitz  from the Wachtell,

14    Lipton Law Firm and Mr. P.J. Mode, Senior Counsel at

15    Citigroup.

16          THE COURT:  Good morning.  To bring us up to date,

17    we were here--

18          MR. MILLER:  Your Honor, if I may, Matthew Miller

19    with Jonathan Cuneo from Cuneo Gilbert & LaDuca, here for

20    proposed amicus Stanley Lerner. We would like to be heard

21    briefly if possible, Your Honor.

22          THE COURT:  Okay.  Give me your name again.  I know

23    you are here for Mr. Lerner, the shareholder.

24          MR. MILLER:  Matthew Miller with Jonathan Cuneo.

25          THE COURT:  Okay.  I have not ruled on your motion.

1    The SEC is happy for you to express your comments, which I

2    think I have no objection if you want to make your views

3    known.

4         As I was about to say, we have had additional

5    pleadings by both Citigroup and the SEC in response to a

6    series of questions which I issued after our last hearing.

7    You had made a motion to appear as amicus.  I'm perfectly

8    happy for you to put on the record your thoughts.  I'm not

9    sure whether the amicus label is necessary or not necessary.

10   But if you have something you want to add at this point, go

11   right ahead.

12        MR. MILLER:  We think it would be more logical for

13   us to add it after the parties have been heard.

14        THE COURT:  They have sort of been heard.  They have

15   written, I have some specific questions for them.  But it

16   wouldn't particularly involve you.  So, if you have thoughts

17   that you want to express, now is the time.

18        MR. MILLER:  We certainly do, Your Honor.  Really

19   three points we would like to make.  First and foremost, the

20   SEC is seeking civil penalties from the wrong party.

21        THE COURT:  Wrong party?

22        MR. MILLER:  Correct, the wrong party.  The SEC

23   should be seeking to impose civil penalties upon the

24   individual wrongdoers who were responsible for the course of

25   conduct alleged in their complaint.  Congress and the courts

1    have established that there are two purposes to a civil

2    penalty.  One is punishment and the other is deterrence.

3           The SEC has cited to certain factors it will

4    consider in determining whether to impose a penalty upon a

5    corporation.  We think it is more appropriate that the Court

6    rely on the guidelines that Congress has provided as to when

7    it is appropriate to impose a penalty upon a corporation.

8           In a committee report issued in 1990 in conjunction

9    with the enactment of the Remedies Act, it was stated that in

10   cases in which shareholders are the principal victims of the

11   violation the committee expects that the SEC, when

12   appropriate, will seek penalties from the individual

13   offenders acting for a corporate issuer.  That the committee

14   intend that a penalty be sought only when the violation

15   results in an improper benefit to the shareholders.

16          The question here is how did Citigroup and its

17   shareholders make out from this course of conduct.  While on

18   the plus side, the SEC has cited the fact that the company

19   may have sold some bonds in 2007 from for more than it would

20   have otherwise sold them for, if not for inflation in the

21   company's stock price.  And estimates that the gain to the

22   company of anywhere between-

23          THE COURT:  Zero and 123 million.

24          MR. MILLER:  Correct.

25          THE COURT:  Do you know anything about any

1    individuals realizing any great gain from this?  I'm aware

2    that the stock in Citigroup went from about 50-some in '07 to

3    $50 a share and it has plummeted to $3.91 a share.  Do you

4    have any understanding of any individuals would have

5    personally realized any kind of gain from any of this?

6         MR. MILLER:  A number of individuals certainly

7    gained from the course of conduct at Citigroup that really

8    took place between 2005 and 2007 that resulted in the company

9    generating illusory income from investment banking fees that

10   would later be more than reversed 2007 through 2009.

11        THE COURT:  But there is no allegation before me of

12   any wrongdoing before the summer of '07.  I don't know

13   anything about '05 and '06.  Nor is it my -- see, the problem

14   with your position is that you assume I know all about

15   Citigroup.  All I know about is from what has been put before

16   me for the year '07.  I don't rewrite the complaint.  So, the

17   question is whether there is in '07 for the months that I

18   have in front of me, whether this is a fair and reasonable

19   consent decree.

20        MR. MILLER:  In 2007, again, our principal focus is

21   whether it is appropriate to assess a penalty on the

22   corporation.  And it is not here because the corporation did

23   not benefit on net from this course of conduct.  It may have

24   made some money from the bonds.  But the company lost tens of

25   billions of dollars from the underlying CDO positions that

1    were excluded from analysis, that resulted in the financials

2    inaccurate.  They lost tens of billions of dollars, an

3    astonishing amount of money.

4         Beyond that, it is going to cost the company at

5    least several hundred million dollars and probably in excess

6    of a billion dollars to get out from the securities and

7    bond-holder class actions that are pending in New York.

8         All this action does is pile a relatively small

9    additional amount of liability on top of that already

10   existing liability.

11        THE COURT:  If I may ask, Mr. Miller, your bottom

12   line is that I should just reject it?

13        MR. MILLER:  At this point, Your Honor really only

14   has two choices, that is to accept the proposed judgment or

15   reject it.  We certainly think the Court should reject the

16   proposed judgment.  And direct the party to proceed with the

17   litigation.

18        THE COURT:  To proceed with the litigation against

19   the company?  That's who they have sued.

20        MR. MILLER:  That's right, that's who they have

21   sued.

22        THE COURT:  I don't understand your point.  Then it

23   would cost Citigroup money to defend itself to go forward,

24   may or may not lose and maybe they get 75 million more.  If

25   they get more, then your argument is that is more of a

1    penalty on the company.

2            MR. MILLER:  Well the Court shouldn't impose a

3    penalty on Citigroup now, and it shouldn't do it after

4    judgment either.  The Court could simply impose a remedy of

5    one dollar of disgorgement, which is exactly what is provided

6    in the consent judgment.  But forego a monetary civil penalty

7    entirely.

8            The Court could enter judgment for the SEC and award

9    injunctive relief.  We would hope injunctive relief is more

10    meaningful than the injunctive relief presently contained in

11    the proposed consent judgment, which is merely just a generic

12    order prohibiting the company from violating the securities

13    laws which we assume it's already not supposed to be

14    violating.

15            We have suggested several measures, more specific

16    measures.

17            THE COURT:  I have to be frank, I do their response

18    from compensation committees is correct.  I have no

19    information about compensation and it is not part of the

20    case.  But I am going to ask them.  So I'll ask you too, why

21    not any of the other two remedies that had to do with an

22    independent auditor and lawyer for purposes of disclosure,

23    that is in the Bank of America cases?  Is that something you

24    think would be useful here and is not otherwise in place?

25            MR. MILLER:  It might be helpful.  I mean, we think

1    more independent auditing would certainly be helpful.   In

2    looking at what went wrong here and what might prevent it, we

3    think there is really one document in all the materials

4    provided by the SEC that really summarizes what happened

5    here.

6              That is page 23 of the first appendix.   It's

7    contained in exhibit two.   It's a page of a presentation

8    prepared, according to the SEC, by certain of the investment

9    bankers of Citigroup in April of 2007.   It is a page entitled

10   Excluded from Analysis.

11             On this page, the author of this document, who has

12   never been identified in this proceeding, goes out of his or

13   her way to disclose the fact that the company has the super

14   senior positions on CDOs in the amount of $14 billion, as

15   well as exposure to liquidity puts of $23.2 billion.

16             I have additional copies of this page, if the

17   Court--

18             THE COURT:   This is exhibit two?

19             MR. MILLER:   It is contained in exhibit two.   It is

20   a page, bates numbered--

21             THE COURT:   Bates stamps, what is it?

22             MR. MILLER:   Bates number ending in 3082.

23             THE COURT:   Okay, I've reviewed these documents.   Go

24   ahead.

25             MR. MILLER:   Somebody decided that these holdings or

1    exposures should be excluded from analysis.  Apparently it

2    was investment banker, it wasn't the CFO.  It came from

3    investment banking.

4         How in the world does an investment banker decide

5    what should be excluded from analysis or not?  How do we

6    prevent this from happening again?  This document is

7    remarkable, in a lot of ways it is contradictory.  It states

8    that the super senior tranches is viewed by the rating

9    agencies to have a probability of default of less than zero

10   to one percent, that's less than one in 10,000.  But at the

11   same time, it says that we actively seek to hedge this book

12   through buying protection.

13        Why in the world would they be buying protection for

14   something that they really thought had a risk of default of

15   one in 10,000?  If the risk of default was one in 10,000, why

16   does this page even exist?  Theoretically, there may have

17   been some risk that Citigroup headquarters was going to be

18   destroyed by tornado.  But there is no page saying, excluded

19   from analysis, tornado damage.

20        So, somebody was obviously covering their back side

21   by creating this document because they really thought there

22   was exposure here.  Otherwise, the document would not exist.

23        Yet, investment banker is permitted to make a

24   decision to exclude it from analysis.  And then they send us

25   on to the CFO.  He ignores what should have been an obvious

1    red flag.  This document raises more questions than it

2    answers.

3         So going forward, we need managerial changes and

4    structural changes within Citigroup to prevent this from

5    happening.

6         THE COURT:  They have made managerial changes.  The

7    people are not there anymore.  As far as I understand, the

8    management group and board of directors, with few exceptions,

9    don't have the same people.  So that has been done, as far as

10   I understand.

11        So, what are the other issues that I'm looking at

12   besides the change in -- Do you not agree that there have

13   been managerial changes, both on the board and the officers

14   and directors?

15        MR. MILLER:  By managerial, I'm looking more to

16   structural changes in the way the corporation is managed,

17   particularly with respect to the investment banking, how

18   investment banking relates to the financial reporting

19   apparatus within the company.

20        We personally, we don't think that anything in this

21   proposed consent judgment will deter the investment bankers

22   from doing precisely what they did in this instance.  In

23   telling the CFO that we think this should be excluded from

24   analysis.  The reason it was excluded from analysis was so

25   the investment bankers could make more money generating these

1    instruments.  That's why it was excluded from analysis.

2         The investment bankers are not punished here.  The

3    investment bankers made tens of millions of dollars in

4    bonuses, none of which look like they're likely to be

5    recouped in any proceeding that's currently pending.

6         THE COURT:  Is it your position that the investment

7    bankers violated the securities laws?  I'm not sure what

8    you're saying.

9         MR. MILLER:  My point is we don't know exactly who

10   violated the securities laws other than Mr. Crittenden, who

11   has already been implicated in the administrative proceeding.

12        THE COURT:  He has already settled.  He is beyond by

13   purview.

14        MR. MILLER:  Agreed.  We think it is unlikely that

15   the responsibility for excluding the CDO analysis rested

16   entirely with Mr. Crittenden.

17        Our point is--

18        THE COURT:  So, as a practical matter, what are you

19   suggesting?  There have been changes in managers.  I'm not

20   litigating your case as you well know.  And I don't have the

21   power to say well Mr. Crittenden didn't pay enough or they

22   should have looked for somebody else after two years.  So, to

23   be helpful, if you want to serve the purpose of amicus, I

24   have to understand what it is that you are suggesting.  I

25   know that you think that you have allegations in your suit

1    that are not being litigated here.  But that's proper

2    obviously.  You have a mismanagement argument that they don't

3    have in a securities case.

4         And I don't tell the SEC who to charge obviously.

5    I'm bound by the complaint.  So, as you said, it is up or

6    down.  Is there something specific that you would offer the

7    Court at this juncture?

8         MR. MILLER:  We've already outlined a number of

9    these measures in our first set of papers that we filed.  We

10   understand the Court's point about compensation but we did

11   outline also a number of changes with respect to internal

12   auditing and accounting.

13        THE COURT:  Could you remind me what has not been

14   responded to in your mind satisfactorily by the SEC?  Because

15   I asked specifically both parties to respond to your

16   suggestions.  I thought the SEC did say something.  So I

17   don't know whether you find their answers, what you have to

18   say about their response.

19        MR. MILLER:  I don't have those in my notes in front

20   of me but I could get them later in the proceeding.

21        THE COURT:  Okay.  Well, this was the time, sir.

22   All right.  I do have some questions for the other parties.

23   Thank you.

24        MR. MILLER:  You are welcome.

25        THE COURT:  Ms. Williams, I do have a couple of

1    questions I would like to ask if I may.  Then I might have

2    some for Mr. Karp as well.

3         As I said, you have now answered, I think, the

4    questions I posed, although some of them basically I'd like

5    to follow up on some of the answers if I may, a couple of

6    things.

7         How was it, if you know, that management, senior

8    management, you make reference to this in your appendix,

9    exhibit one to your appendix.  You say there are two

10   paragraphs in that appendix in the complaint, I'm sorry, 43

11   is one paragraph that you refer to senior management, and 28.

12        These are the only two times that you sweep in a

13   large number of people including the CEO and the chairman of

14   the board.  You said they anticipated that they would have

15   record losses in the range of 300 to 500 million.  Then on

16   paragraph 43, that they were aware that the super senior

17   tranches were the source of the increase losses.

18        First of all, on what basis do you make those

19   statements?  What is your evidence to support that?  Did

20   people testify, are there documents that have not been given

21   to me that would reflect this?

22        I see that Mr. Prince was present during some

23   telephone calls with some stockholders.  The documents in

24   front of me do not otherwise, there is not a trace of

25   documentation that would support either of those paragraphs.

1          MS. WILLIAMS:  Yes, Your Honor.  In our

2     investigative record, we do have documents that support the

3     allegations that are in those two paragraphs.  And we did not

4     provide them to the Court because the documents that you

5     requested were evidence of our 17(A)2 claim.  And while these

6     are allegations with regard to all of the claims, we really

7     tried to limit the documents that we provided to Your Honor

8     to those that supported our 17(A)2 claim, as requested in

9     your order.

10          THE COURT:  Well, it would go to the issue of why

11     some people are charged and why some are not, which obviously

12     is very important.  What kind of documents are you talking

13     about?  This is a critical issue.

14          MS. WILLIAMS:  I think I can shed some light on

15     that, Your Honor.  Our claim is about false and misleading

16     disclosures concerning sub-prime exposure.  While these two

17     paragraphs list a number of people who at the company who are

18     senior management who were aware that the super seniors might

19     suffer losses, these individuals, we have no evidence in our

20     record, were involved in the disclosures except Mr.

21     Crittenden who is named in both of those paragraphs.

22          THE COURT:  I don't want to quibble with you but the

23     CEO is on the telephone when they're making the disclosures;

24     he hears him say what he says.  So, it is a curious sort of

25     way to proceed.  You say, you put these paragraphs in that

1    are somewhat of a bombshell in a way.  You know they're going

2    to get headlines.  And they do get headlines as soon as you

3    put people's names to them.

4         Why are they there then, why are these paragraphs

5    there if they don't serve a real purpose?  Second of all,

6    what is the relationship between losses and either

7    non-disclosure or duty to disclose exposure to sub-prime that

8    had been rated as the most safe.  Just because you are

9    suffering losses, is it your position you have a duty to

10   disclose the exposure?  I'm not sure, saying you know about

11   losses doesn't necessarily mean that you know that the

12   disclosures of 13 billion aren't right.

13        MS. WILLIAMS:  That, I think, is our point, Your

14   Honor.  We brought the claims against those two individuals

15   who did have the knowledge or at least access to the

16   information about sub-prime exposure.  We provided documents

17   to Your Honor, for example, the flash deck and the other

18   overview presentations from April and July in which sub-prime

19   exposure was listed and the super seniors and liquidity puts

20   were included in those charts.

21        What we have is evidence that Mr. Crittenden and Mr.

22   Tildesley received those presentations.  And then we made

23   clear that we -- that they do not recall reviewing those

24   presentations.  We do not, however, have evidence that these

25   other individuals who are listed in paragraphs 28 and 43

1   received the information about these sub-prime exposure which

2   is what our claim is, that Citigroup failed to disclose the

3   sub-prime exposure.

4          I will say that in those investor calls, they did

5   include the losses on the super seniors and the liquidity

6   puts in the loss figures that they provided in their

7   disclosures.

8          So while it is a point not as clear as it could be,

9   what we're saying is that they did disclose the losses but

10  what they failed to adequately disclose was sub-prime

11  exposure.

12         Our position in putting these paragraphs in about

13  the losses, is that we think that the company should have

14  realized that the sub-prime exposure to the super seniors and

15  liquidity puts should have been disclosed.  They knew that

16  they were suffering losses.  What we have though is testimony

17  from individuals who say that they did not understand that,

18  even though they had suffered these losses, which we will

19  admit are small compared to the total book of these assets,

20  that they did not understand that the assets had a risk of

21  loss or risk of default.

22         There is documentation such as the presentation

23  where these assets are excluded from analysis which also

24  reiterates that, that there was thinking in the investment

25  bank that these assets did not have a risk of default

1    notwithstanding the fact that they had taken these losses.

2         THE COURT:  Well, what is the impact of investment

3    folks thinking there wasn't a substantial -- and

4    Mr. Crittenden obviously did as well, that there was not a

5    risk, that these were not risky investments?  What is the

6    legal impact of that?  Let's assume that it was -- to the

7    extent it was even thought about -- and that's probably the

8    problem here is that nobody was thinking about it

9    particularly.  But to the extent that anyone thought about

10   it, they concluded that it wasn't material.  Does that mean

11   they had no duty to disclose?

12        MS. WILLIAMS:  No, Your Honor.  In fact what we have

13   the investment bankers had excluded these assets from

14   analysis.  But there were also presentations made by the risk

15   management organization of Citigroup where they did not

16   exclude the super seniors or liquidity puts from the

17   sub-prime exposure.  They in fact included them in the charts

18   where they're listing sub-prime exposure.

19        And what we're alleging is that, if Mr. Crittenden,

20   Mr. Tildesley, the company as a whole, had sat down and

21   reconciled this, they would have disclosed the fact that

22   these assets were sub-prime exposure, notwithstanding the

23   fact that they might have had a small risk of default.  The

24   fact is that all of the presentations categorized them as

25   sub-prime exposure as where sub-prime exposure was found.

1          Yes, the investment banking presentation at the end

2    said that they were excluding it from analysis because of low

3    probability of default but the risk management presentation

4    did not do that.

5          THE COURT:  Where is that?  What document are you

6    referring to?

7          MS. WILLIAMS:  That can be found in exhibit three.

8          THE COURT:  This is the second quarter earnings from

9    for review?  Are you talking about, looks like Bates stamp

10   ending in 198?

11         MS. WILLIAMS:  Yes, Your Honor.  We just included

12   the excerpt from the risk management presentation.  We also

13   have--

14         THE COURT:  Is it your position that the higher ups

15   did not read this?  Or that they didn't understand it?

16   They're telling them they have an exposure here.

17         MS. WILLIAMS:  The evidence in our investigative

18   record suggests that, while these documents were provided to

19   Mr. Crittenden and Mr. Tildesley, their testimony is that

20   they do not recall reviewing them.  We also have testimony

21   where these documents were presented in what is called a

22   flash call which is a meeting/conference call.  The evidence

23   is no one recalls the super seniors or liquidity puts being

24   the subject of discussion during those meetings.  So--

25         THE COURT:  The fact that no one recalls reading

1    them or discussing them, what happened to the willful

2    blindness by the way?

3        MS. WILLIAMS:  Your Honor, this is why we brought

4    our claim for non-scienter fraud against the company.  We

5    think that was carelessness on the part of these executives.

6    And that they lacked reasonable care.  And that this was

7    unreasonable which is why we thought that--

8        THE COURT:  That's not responding to my question.

9        MS. WILLIAMS:  I'm sorry.

10       THE COURT:  Willful blindness is not negligence.

11       MS. WILLIAMS:  I understand, Your Honor.  We did not

12   have evidence in our investigative regard of willful

13   blindness that Mr. Crittenden, Mr. Tildesley, those

14   individuals who were in charge of and responsible for the

15   disclosures were willfully blind; that they knew and turned a

16   blind eye to this.

17       Some of these documents, for example the one you are

18   looking at, was a 96 page presentation.  This is seven pages

19   in the presentation.  There is testimony that they relied on

20   the actual presentation where there was a discussion and it

21   was not their practice to look through every page of the 96

22   page document that they received.  Again, we believe it was

23   carelessness on their part.  They were provided with this

24   information and they should have looked and become familiar

25   with this before they made the misleading disclosures.

 1          THE COURT:  What about the fact that Mr. Crittenden

 2    says affirmatively in July that our sub-prime exposure, the

 3    total exposure is 13 billion.  Is that not a half truth?

 4          MS. WILLIAMS:  Your Honor, we believe that, that was

 5    an inaccurate and misleading statement.  We also have

 6    testimony from Mr. Crittenden and evidence suggests that, at

 7    the time he made that statement, because he was careless in

 8    not looking through documentation that had been provided to

 9    him, he did not know that the company actually held super

10    seniors or liquidity puts in July as of the time that he made

11    that statement.

12          THE COURT:  At some point in time he knew that they

13    did. Right?

14          MS. WILLIAMS:  Yes, Your Honor.

15          THE COURT:  And he decided that it wasn't risky.  I

16    want to understand from the SEC's points of view what is the

17    legal significance of him knowing that there is more in terms

18    of super senior tranches and liquidity puts than is being

19    told to the investor.  But he is feeling confident, I'm

20    giving him the benefit of doubt, he is confident that these

21    are not at risk.  That this does not put the company at risk.

22    What is the legal significance of that?

23          MS. WILLIAMS:  Legally, Your Honor, we believe that

24    that is why he caused Citigroup to make false and misleading

25    disclosures.  Legally what we're saying is that, that was an

1    unreasonable position and that he was careless.

2          THE COURT:  Why is that careless as opposed to, if I

3    -- let's take it a hypothetical so I can see.  I'm trying to

4    understand your legal position.  I'm trying to understand how

5    it is you draw this distinction between his negligence,

6    willful blindness scienter.  And I'm not sure that scienter

7    doesn't include willful blindness in the area of the SEC

8    laws.  But the point is he -- is there any evidence that they

9    consulted with attorneys about materiality?

10          MS. WILLIAMS:  Not that I'm aware of, Your Honor,

11    no.

12          THE COURT:  So we don't have them relying on their

13    lawyers, in-house or out-house as far as you know.

14          MS. WILLIAMS:  No.

15          THE COURT:  So he, at some point in time in the fall

16    of; 07, concludes that this is not material.  Correct?

17          MS. WILLIAMS:  What the evidence shows, Your Honor,

18    is that, while he became aware that they held super seniors

19    and liquidity puts, there were extremely small losses that

20    were being suffered by that.  His testimony is that he did

21    not believe that these effected the credit worthiness of the

22    assets or that they had a risk of default.  It was not until

23    the rating agencies downgraded these securities and other --

24          THE COURT:  In October.

25          MS. WILLIAMS:  In October, that he actually realized

1    that these had a serious risk of default.

2              THE COURT:  I understand.  I understand the facts.

3    That's not my point.  My point is, if he knows that they have

4    additional sub-prime exposure but he does not think that it

5    effects their credit worthiness or there is a risk of

6    default, what is the legal ramification.  Does that preclude

7    you from arguing scienter, because we're giving him the

8    benefit of doubt in saying it not may not be, quote, material

9    if you think there is no exposure.  Or is it your view that

10   this is material information irrespective of what kind of

11   risk it entails.  It is a legal question.

12             MS. WILLIAMS:  I understand.  In the legal question,

13   the first statement that you made was that he knew that they

14   had sub-prime exposure from these assets.  And that is not

15   something that our evidentiary record shows.  But

16   additionally, Your Honor, what we have -- and it was a close

17   call.  We did consider this carefully.  Whether or not this

18   should be a 10-B case or 17-A case.  And at the end of the

19   day, what we determined is, based on the facts that we have

20   in our evidentiary record, we didn't see that the evidence

21   clearly demonstrated an intent to defraud.

22             THE COURT:  I understand that.  Let's take a

23   hypothetical, let's put Mr. Crittenden aside and let me say

24   there are a group of people in the corporation who in good

25   faith think that certain assets don't present a risk, i.e.

1    they don't effect the credit worthiness or there is not a

2    reasonable probability that the stock would be effected.  Do

3    they have a duty to disclose?  That's all I'm trying to

4    understand.  Give me the law please.

5         MS. WILLIAMS:  Yes, they do, if they have been

6    provided with information that would have educated them about

7    that view and they failed to consider the information that

8    they had been provided.  If they had been provided with

9    documentation showing that these assets were actually should

10   be included in sub-prime exposure, that the risk management

11   organization of their company had included them as sub-prime

12   exposure and they were careless in not reviewing that

13   information, then yes, they should -- we have a claim against

14   them.

15        THE COURT:  Can we go back again?

16        MS. WILLIAMS:  Sure.

17        THE COURT:  What is materiality?  We'll go slower.

18   What is materiality in a situation where you are deciding

19   you've exposed, you have declared 13 billion exposure from

20   sub-prime.  I take it the remaining 43 were characterized as

21   safer.  Is that true or false?

22        MS. WILLIAMS:  They were not referenced in the

23   disclosures at all.  But internally, my understanding is they

24   did not disclose their assets because there was, A,

25   carelessness in not looking through the documentation, but B,

1    there was I guess thinking from the investment bank that they

2    had a low probability of default.

3            THE COURT:  Right.  We know that they thought --

4            Mr. Karp, is there a difference between the

5    13 billion and the 43 billion that did not get disclosed

6    factually in terms of their riskiness?

7            MR. KARP:  There is, Your Honor, and they were

8    accounted for also in Citigroup's financial statements, which

9    is why there is no need for a financial misstatement.  We're

10   talking about an earnings disclosure call in a company with a

11   two plus trillion dollar balance sheet, not every class of

12   assets obviously needs to be disclosed on that earnings call.

13   There was a consensus view within the organization at the

14   time of both sets of disclosures in July and in October that

15   the super senior securities and the liquidity put securities

16   did not pose a material risk of loss.  In Mr. Crittenden's

17   view were not as a result of sub-prime exposure.

18           THE COURT:  Were not what?

19           MR. KARP:  Sub-prime exposure because they were

20   rated above AAA.  And Mr. Crittenden did not believe that a

21   security within an above AAA rating constituted sub-prime

22   exposure.  Mr. Dugan, as referenced in our papers to Your

23   Honor, indicated in 2008--

24           THE COURT:  Okay.  So the 13 billion, you can't put

25   them in the same category as the 43 billion in terms of how

1    they had been assessed by the moodies or whomever.  In fact,

2    my understanding, the super seniors were not assessed because

3    they were thought to be even safer than the AAAs.

4            MR. KARP:  That is correct, Your Honor.

5            THE COURT:  Now, can I get back to you?  I just want

6    to get the facts.  Listen carefully if you would please.

7            MS. WILLIAMS:  Yes, Your Honor.

8            THE COURT:  I want to know whether you agree with

9    what he says which is that, not with hindsight but, if you

10   are back, not with the benefit of looking backwards.  But he

11   is saying that they reached at certain point in time, for

12   lack of better word, a reasoned decision, not to disclose

13   them because they said that they didn't pose a material risk.

14   If that is true, is that a violation of the security laws?

15   That's what I'm trying to understand.  Do they have duty, is

16   the notion of materiality relevant or irrelevant for the

17   purposes of the securities law?  I want you to educate me;

18   that's where we are here.

19           MS. WILLIAMS:  The notion of materiality is relevant

20   to the federal securities laws.  Here, the problem I think

21   that I'm having is that the factual premise of the question

22   is something that we disagree with.  We are not, we do not

23   believe that there was a reasoned decision made to exclude

24   them based on all of the information that was available.

25   What we are saying is that the risk management organization

1    had documentation that was provided in the disclosure process

2    to the individuals making disclosures: Mr. Tildesley and

3    Mr. Crittenden.  They included these assets as sub-prime

4    exposure.  They included them with the other 13 billion in

5    the same chart.

6         So our position is that those had sub-prime exposure

7    and that they should have been disclosed.  We understand that

8    Mr. Crittenden and Mr. Tildesley did not review those

9    documents.  We understand those documents by risk management,

10   we do not have evidence that they were discussed during the

11   disclosure preparation meetings.  We feel that that was

12   carelessness and they should have been discussed.

13        THE COURT:  Let's say they were discussed and they

14   took it upon themselves to actually have a discussion and

15   they said to themselves, we don't agree; these things are so

16   safe we have no risk.  Is that violating the laws?  That's

17   what I'm trying to understand.  Your argument is that they

18   should have been more careful and had a better discussion

19   about it.  Is that basically the crux of your case?

20        MS. WILLIAMS:  That's part of our case.  But

21   additionally, because they were experiencing losses, and

22   while the losses might have been small, that to us means that

23   these did have sub-prime exposure.  First they had

24   documentation from the risk management saying that it was

25   sub-prime exposure.  Then they started suffering losses

1    which, to us, shows that they had sub-prime exposure.  So we

2    think it was an unreasonable position to take to say that we

3    understood that they were suffering losses.  We're going to

4    disclose the losses they were suffering but we're not going

5    to disclose our holdings of these assets because we still

6    think that they had no risk of loss.

7         THE COURT:  What is your position in response to the

8    lawyers' statement that many other large corporations similar

9    to Citigroup at the time -- I mean, we can only judge it

10   putting ourselves in the shoes of the people at the time.  We

11   now know that the exposure was devastating and the markets

12   crumbled to their feet, thanks to the miscalculation for lack

13   of a better word.

14        But were there other corporations that were

15   disclosing at this time, this kind of super senior tranches

16   and liquidity puts?  Was this highly uncommon or was this

17   being done?

18        MS. WILLIAMS:  We understand that there were other

19   financial institutions who disclosed their holdings of super

20   seniors and liquidity puts.  There were not very many.

21   Citigroup was one of the first.

22        THE COURT:  I'm sorry?

23        MS. WILLIAMS:  Citigroup was one of the first to

24   disclose the sub-prime exposure.  I would say that in the

25   other records that we have from other financial institutions

1    they did not necessarily lump the super senior and liquidity

2    puts exposure with the other exposure from sub-prime assets

3    that they had.  But if they were exposing it, they did

4    include those assets in the disclosure as other sub-prime

5    assets.

6         What we're saying here is that Citigroup didn't

7    necessarily have a duty to disclose their sub-prime exposure

8    at the time.  We agree with that statement.

9         THE COURT:  You do.

10        MS. WILLIAMS:  Yes.  But once they decided to

11   disclose sub-prime exposure, they needed to make an accurate

12   and not misleading disclosure.  We believe that it was

13   misleading in this case.

14        THE COURT:  What in your injunctive relief that has

15   been offered to me -- I agree entirely with your argument

16   that I'm not into setting compensation and that Judge

17   Rakoff's suggestions in the Bank of America case do not apply

18   having to do with outside compensation consultant or with an

19   executive compensation recommendation, et cetera.  But there

20   were two aspects of the Bank of America injunctive relief

21   which you do not have.

22        And that one is an independent auditor, I'm reading

23   from his opinion in the Bank of America where he accepted the

24   consent judgment.  "Independent auditor to assess over the

25   next three years whether the accounting controls and

1    procedures are adequate to assure proper public disclosure.

2    Secondly, the bank's engagement in consultation with the SEC

3    of an independent disclosure counsel to report solely to the

4    bank's audit committee on the adequacy of the bank's public

5    disclosure over the next three years."

6           We have a problem that is similar insofar as it is

7    your position that there was negligent public disclosures.

8    You tell me in your response, when I ask what about these

9    suggestions, well, it's okay because you have the

10   Sarbane-Oxley statute will take care of it.  And there have

11   been management changes.  But Sarbane-Oxley was in existence

12   at the time this happened and obviously didn't stop anything.

13          Why don't you include anything in the remedial?  The

14   remedial says you won't violate the securities law.  They

15   can't violate the securities law anyway; so that injunctive

16   relief is meaningless.  The penalty in terms of dollars may

17   be reasonable.

18          But in terms of doing anything to make sure that

19   what you refer to as flawed processes don't happen again, I

20   don't see a thing.  That is actually what I find troublesome

21   about this proposal.

22          MS. WILLIAMS:  Your Honor, what we, and this is

23   highlighted I believe in Citigroup's brief.  But what we

24   understand is, after we brought our investigation, Citigroup

25   did make dramatic changes to its disclosure controls and

1    processes.  Specifically, they have changed the formal

2    process, they have established an earnings subcommittee to

3    oversee the preparation and review of their public filings

4    regarding earnings.  They also have a requirement that those

5    individuals who are responsible for disclosures are to

6    execute a statement of accountability.

7            So we consider those to be good byproducts of our

8    investigation.  That is not something that we've included in

9    the injunctive relief here but we note that they have made

10   those changes.  Additionally, there have been substantial

11   changes made to their risk management organization.  We know

12   that risk management was the organization here that did

13   include the sub-prime exposure in their presentation but

14   there is no evidence that we're aware of regarding whether or

15   not that sub-prime exposure was discussed in the flash calls

16   in preparation for the earnings disclosures.  So we do note

17   now that there have been comprehensive changes to the risk

18   management process.

19           And I will note that, in Bank of America, my

20   understanding is the lawyers had some involvement in drafting

21   the proxy materials that were at issue.  We here do not have

22   evidence of any involvement by counsel in actually

23   developing, drafting, reviewing the disclosures.  So, while

24   a--

25           THE COURT:  That may be a good thing.  I don't

1    understand why, perhaps arguably didn't work in Bank of

2    America.  But why is the idea of an independent counsel

3    involved in this process not a positive?

4              MS. WILLIAMS:  I think that they determined that

5    independent counsel might be necessary here because the

6    counsel that was not independent had some involvement in the

7    drafting; whereas, here we don't have that issue here.

8              THE COURT:  You don't have the issue because you

9    don't have them consulting with lawyers at all.  Maybe if

10   somebody had consulted with lawyers who were independent and

11   diligent that you might have solved the problem.

12             MS. WILLIAMS:  My understanding is that the

13   disclosures were sent to counsel but we do not have evidence

14   in our record that there was any requirement for them to sign

15   off on the accuracy of those disclosures.  Perhaps Mr. Karp

16   would be better able to explain whether or not lawyers need

17   to sign the statement of accountability that they now require

18   people involved in the disclosures.

19             THE COURT:  Mr. Karp, in a minute I would like to

20   hear about this because if you look at the final judgment,

21   when you sit and analyze the sum, I agree with you, it is

22   very hard for me to disagree, you had an economic analysis

23   done.  The range came out, the pecuniary gain to the company

24   was zero to 123 million.  You can't really in good faith say

25   that this figure is right or wrong, it is reasonable maybe if

1    it fits in the scale of things.

2           But there is nothing in here to address what you

3    call the flawed systems that resulted in this under

4    disclosure of sub-prime.  Not a thing.  The 75 million is not

5    going to deter anybody from doing anything.  The company, as

6    Mr. Miller points out, the shareholders are paying.  The two

7    individuals have paid.  They have made their peace with the

8    SEC.  One of them still works there, one doesn't.  It is

9    hardly -- $100,000 fine is not a deterrent to corporate

10   America to do a better job.  I'm sorry.

11          MS. WILLIAMS:  We did carefully consider the fact

12   that they have made substantial changes in management,

13   substantial changes in their disclosure processes.  That was

14   after these disclosures and false misleading disclosures came

15   to light.  We consider those to be byproducts again of our

16   investigation.  We consider that in proposing the relief in

17   this case.

18          We did consider what they did in Bank of America,

19   and whether or not those proposals were necessary here.  And

20   the Commission, after careful deliberation, determined that

21   they were not in this case based on the facts in the

22   evidentiary record.

23          THE COURT:  Why is it that the judgment you asked me

24   to sign says the commission may by motion propose a plan to

25   distribute the funds.  Don't you have to, and such a plan may

1    provide.  We've already concluded that you have to do this

2    proposed the way they're going to distribute it, two, that

3    you are going to make sure that the people had possible

4    access to this information will not get any of the money.

5    And that you are going to give it only to the people who

6    bought stock is my understanding.  Is that correct?

7         MS. WILLIAMS:  Yes, Your Honor.  That is absolutely

8    our intent.  I believe the phrasing in this judgment was just

9    in case -- and I can't imagine anything happening, where it

10   would be impractical to do so because perhaps the

11   distribution would be financially impractical.  We cannot

12   think of any case where that may happen.  It is fully our

13   intent to establish the fair fund and to distribute the money

14   subject to a motion.

15        THE COURT:  You have to have a plan to distribute

16   75 million.  I'm sure the courts would like to have the money

17   for everybody, it's being deposited here so it has to be

18   distributed.  I'm not willing to accept something that says

19   "may."  Otherwise, I don't ever have anything to do with this

20   if you choose not to.  Those two lines are totally

21   inconsistent with everything that you've said here.

22        MS. WILLIAMS:  The "may" is not whether it would sit

23   in the court's account forever.  It's whether it would go to

24   Treasury or a fair fund.

25        THE COURT:  Or what?

1          MS. WILLIAMS:  To the Treasury Department or whether

2     it would be distributed via fair fund.  And again, it is

3     fully our intent to distribute it via fair fund.

4          THE COURT:  I won't sign what says "may."  You can

5     figure out what you want to do with pages three and four

6     because "may" gives essentially gives you an out.  That is

7     totally unsatisfactory.

8          MS. WILLIAMS:  I understand, Your Honor.

9          THE COURT:  If the Court is supposed to approve --

10    there are two parts to this: approving the consent judgment

11    and the approving the fund distribution.  So if you say you

12    "may" submit that, then I'm not -- I have no role in it.  And

13    I'm at least, it seems to me if anything is my duty, it's to

14    make sure that the harmed shareholders are the ones that get

15    that money.  You have defined them somewhere.  I have to

16    approve that.  And two, that certain shareholders don't get

17    the money; otherwise, this is completely counterproductive.

18    You can think about that for a little bit as well.

19          Let me see if I have any other questions before I

20    turn to Mr. Karp.

21          Do you have any evidence that anybody sold in the

22    fall or before November, mid November and made a killing out

23    of all this before the stocks started to -- have you looked

24    into that?

25          MS. WILLIAMS:  Your Honor, we looked into a wide

1    range of things in our investigation.  It was very broad, it

2    lasted several years.  We brought the claims that were

3    supported by the record.  We did not find evidence to

4    support--

5             THE COURT:  Insider trading.

6             MS. WILLIAMS:  No, Your Honor, with respect to our

7    investigation in this case, regarding Citibank CDO business

8    and their disclosures, we did not find any evidence to

9    substantiate bringing those claims of the federal securities

10   laws.

11            THE COURT:  Your reason for emphasizing the losses

12   is not that, is to say that you think that that would have

13   given someone reasonable notice that they had a problem on

14   their hands, that it isn't necessarily the case because you

15   had a loss from the sub-prime that you then automatically

16   have a duty to disclose.  You think it is just another flag

17   that would have given someone notice that there was a

18   problem?

19            MS. WILLIAMS:  We think absolutely it was a flag,

20   Your Honor.  Additionally, they were provided with numerous

21   documents that we believe also were flags that should have

22   alerted them that these super senior liquidity puts should

23   have been excluded as sub-prime exposure in the disclosures.

24            THE COURT:  When you make allegations regarding

25   senior officials including in two paragraphs only based on

1    the losses should have given them notice of something, the

2    question is in the public's mind, why are these people, and

3    this is where the SEC is doing a disservice to the public

4    because we want to understand why it is that the senior

5    officials who are the people that are paid most, why they're

6    not before the SEC or the court or in an administrative

7    proceeding.

8         So you add two paragraphs that basically look like

9    you are charging them with some kind of knowledge.  Then when

10   we get here, the senior management -- I'm not talking about

11   Crittenden but I'm talking about the people you have

12   identified in paragraph 43 of your complaint, which is

13   understood by the media and the public to say, these people

14   had knowledge that they were making false or misleading

15   disclosures.

16        It is your obligation, it seems to me, to educate

17   both me and the public, and if your position is that losses

18   don't necessarily mean that you have disclosed sub-prime

19   exposure inaccurately or in a misleading fashion, you have a

20   duty to be a lot clearer about this because people's

21   reputations are at stake.  You know as well as I know, that

22   when you put a paragraph like that in there and then you

23   identify the individuals, people make certain assumptions.  I

24   think you have to clarify what it is that you are, your

25   investigation has disclosed regarding the people you didn't

1   go after who are higher up.

2          MS. WILLIAMS:  Yes, Your Honor.  Our investigation

3   had to do with the false and misleading disclosures about

4   sub-prime exposure.  These individuals who are listed as

5   knowing, as anticipating that the super seniors and liquidity

6   puts might suffer losses who we did not bring claims against

7   are not individuals who are involved in the disclosure

8   process.  They did not develop the disclosures.  They did not

9   review the disclosures.  They did not approve the disclosures

10  according to the evidence in our record.  And they did not

11  receive, and this is really a significant point, the

12  information that Mr. Crittenden and Mr. Tildesley received

13  regarding the super seniors and liquidity puts being

14  concluded as sub-prime exposure in the disclosure preparation

15  documents.  These individuals who were not charged did not

16  receive those documents.  Those documents we believe would

17  have alerted Mr. Crittenden and Mr. Tildesley--

18          THE COURT:  Who does the certifications under

19  Sarbanes-Oxley, is it the CFO?

20          MS. WILLIAMS:  With regard to the 8K,there was only

21  one public filing and that was the 8K in October of--

22          THE COURT:  Mr. Crittenden or--

23          MS. WILLIAMS:  It was Mr. Crittenden, Your Honor.

24          THE COURT:  Prince doesn't have any obligation to

25  sign off on these?

1          MS. WILLIAMS:  Not with regard to the disclosures at

2     issue in this case, no, Your Honor.  We do not have any

3     evidence of Mr. Prince or any other individuals listed in

4     these paragraphs having any involvement in the disclosures.

5     And again our case is about the false and misleading

6     disclosures.  The people closely tied, the ones

7     responsibility for the disclosures were Mr. Crittenden and

8     Mr. Tildesley.

9          THE COURT:  Are those disclosures made solely on

10     these flash calls or also in the 8K?  I can't recall.

11          MS. WILLIAMS:  There were disclosures made on

12     investor calls which are different than the flash calls. The

13     flash calls are to prepare the internal Citigroup executives

14     for the disclosures.  The disclosures were made on July 20

15     and 27 on investor calls.  Additionally, there was an

16     investor call on October 1.  That transcript from that call

17     was incorporated into an 8K that was filed that same day.

18     Then there was a call on October 15.

19          THE COURT:  So there is a, in your view, a false 8K

20     filing?

21          MS. WILLIAMS:  Yes, Your Honor.

22          THE COURT:  But those are signed off on by

23     Mr. Crittenden only?

24          MS. WILLIAMS:  Yes, Your Honor.

25          THE COURT:  Okay.  I think that helps.

1          Mr. Karp, can I hear about what changes have been

2     made and why we don't have anything in this agreement that

3     assures me that these changes are the best we can do?  You

4     theoretically could change them tomorrow.  You could bring,

5     do anything you want, the corporation.  There is nothing

6     under this agreement other than this statement that you won't

7     violate the laws.

8          MR. KARP:  I think the statement that Citi will not

9     violate the federal securities laws is a more important

10    statement than Your Honor --

11         THE COURT:  Credit.

12         MR. KARP:  Absolutely.

13         THE COURT:  Because they have an obligation to not

14    violate the laws.  Why do I need to write that down?

15         MR. KARP:  If you think about the timeframe because

16    I think that the timeframe in laying it out is very important

17    here.  When Citigroup ultimately determined, Mr. Crittenden

18    working with others, ultimately determined that there were

19    going to be material losses associated with the sub-prime

20    super senior securities and the liquidity puts, Citigroup on

21    November 4th issued an 8K and disclosed the full amount of

22    its expected losses from these instruments.

23         After that, as Your Honor is aware from our papers

24    and from the public record, Citigroup's virtually entire

25    management team turned over.  Citigroup has a new CEO; has a

1     new CFO; it has a new head of investor relations.  It has a

2     new head of risk management; it has a new head of the

3     investment bank.  It essentially has a new board.  There have

4     been nine new independent directors added to Citigroup's

5     board.  The new management team and the new board put in

6     place a number of salutary policies, practices and procedures

7     to deal with a whole host of issues.

8             One of the issues that the board and senior

9     management addressed has to do with the disclosure process.

10    In particular, Your Honor, has to do with the disclosure

11    process surrounding earnings announcements.

12            Citigroup revised its disclosure controls, and

13    disclosure charter, and enacted new disclosures practices.

14    What is critically important here, and I think it relates to

15    a couple of the questions that Your Honor was asking

16    Ms. Williams, Citigroup now requires a whole range of

17    constituencies, including legal, finance, investor relations,

18    tax, treasury, financial planning, strategy compliance,

19    public relations, risk, the chief administrative officer, the

20    controller, the vice chairman of Citigroup to sign statements

21    of accountability.

22            THE COURT:  What does that mean?

23            MR. KARP:  That they're acknowledging that they have

24    reviewed the proposed earning statements or the earning

25    script and to the best of their knowledge and understanding

1    the statements in the script are accurate and complete, to

2    address precisely the series of questions that Your Honor was

3    asking Ms. Williams.  We believe that this is an industry

4    best practice.

5         THE COURT:  How do I know that?  You have to accept

6    the notion that I don't do this every day.  How do I know

7    this is industry best practice?  Has the SEC reviewed this?

8         MR. KARP:  I do not know if the formal details have

9    been presented to the SEC.  I am not aware of other financial

10   institutions that have the breadth of accountability that

11   Citigroup has.  It is certainly a practice that addresses the

12   flaws that the SEC alleges existed.

13        THE COURT:  Who is the counsel you refer to?  If

14   anybody ought to understand this stuff it ought to be the

15   lawyers.  Is it in house or out house?

16        MR. KARP:  With respect to the statement of

17   accountability, it is in-house.  It is the general counsel,

18   Michael Helfer. I should also add that Citigroup uses for its

19   outside legal disclosure determinations, Mr. Alan Beller who

20   was the former head of the SEC's market regulation division.

21        THE COURT:  Why is it not in the consent judgment

22   that -- don't you think that the level of comfort that the

23   public and the Court would have would have made some mention

24   of this?  I'm learning about this for the first time.  It is

25   not an answer to say -- I don't think you addressed it

1    specifically but the SEC said, we should not worry because

2    Sarbanes-Oxley will take care of this.  Well, Sarbanes-Oxley

3    didn't take care of this in the first instance or many other

4    abuses.

5         Why isn't there any reference in the consent that

6    the practices that have been instituted have been reviewed by

7    the SEC and that they believe they will constitute adequate

8    remedial measures and they have to remain in effect for X.

9    period of time.  If you want to change them, you have to get

10   SEC or Court approval.

11        To me, it would make this more palatable than to say

12   -- well, the 75 million is really not the issue which I said

13   before.  It is to try to make sure that -- there is this

14   constant refrain about fraud disclosure practices and this is

15   negligence and therefore we're going to solve these things.

16   Well, I guess everybody agrees that you have gone a long way

17   towards solving them, but there is not a word about it in the

18   consent judgment.

19        MR. KARP:  I guess, Your Honor, the best way for me

20   to respond -- and it is probably more appropriate for

21   Ms. Williams to respond, in our view it was implicit.  This

22   was an exhaustive investigation, as Your Honor is acutely

23   aware of.  There were 28 million pages of documents, two and

24   a half years of investigation.  Many, many depositions were

25   introduced.

1          THE COURT:  Did your client object to that, when the

2     SEC -- To me, that's what we're lacking here.  We're lacking

3     any kind of accountability in terms of the procedures that

4     were supposed to address this.  I know that, I mean, there

5     were alternatives given by Judge Rakoff.  But I don't know

6     why Bank of America didn't do what you claim you've done. But

7     something ought to be memorialized.  To say it is implicit, I

8     won't rely on that.

9          MR. KARP:  Citigroup has a entirely new management

10    team that put in place an entirely new series of state of art

11    enhancements.  It does not just go to risk function, it goes

12    across the board.

13         THE COURT:  I'm only interested in what it is before

14    me.  No one has described that before now.

15         MR. KARP:  What is before you is now a matter of

16    public record is the particular changes and enhancements that

17    have been made to the disclosure process and the earnings

18    review process.  Bank of America was a little bit different

19    because, as Ms. Williams pointed out towards the end of Your

20    Honor's questioning, Bank of America was all about a series

21    of determinations that were made in a proxy offering by

22    in-house and outside counsel.

23         And what Judge Rakoff wrote in his ultimate decision

24    approving the Bank of America/SEC settlement is that the

25    apparent working assumption of the bank's decision-makers and

1    lawyers involved in the underlying events at issue here was

2    not to disclose information if a rationale could be found for

3    not doing so.

4         The proposed remedial step should help foster a

5    healthier attitude of when in doubt, disclose.  That is not

6    the situation here; that's not what the SEC has alleged.

7    That's not what the situation is in this case.

8         This isn't a situation where individuals in

9    responsible positions at Citigroup made determined decisions

10   to conceal from the investing public any material

11   information.  In fact, as Ms. Williams acknowledged and as we

12   pointed out in our papers, Citigroup wanted to be a market

13   leader in terms of disclosing its sub-prime exposure.  The

14   manner in which Citigroup accomplished what it set out to do

15   turned out to be imperfect, to be a bit euphemistic.  But

16   Citigroup's heart was in the right place.  And again, there

17   really aren't--

18        THE COURT:  Don't overdo it please.  I have never

19   seen Citigroup's heart.  I have seen their building but I

20   don't know what their heart means.

21        MR. KARP:  I withdraw any statements about

22   Citigroup's heart.

23        THE COURT:  Can you briefly, again, it is a very

24   frustrating position that one is put in because I don't know

25   what the evidence is regarding the support for paragraphs 28

1    and 43.  I think that the public, part of this process is

2    that the public needs to understand.  There is a suggestion

3    in those paragraphs that senior management, including the CEO

4    and others from the board of directors, had information that

5    was conveyed to them.

6         But no one has ever specified -- I understand that

7    the information indicated that there were losses on these

8    super senior tranches and liquidity puts.  But how was this

9    conveyed to them and what was the context specifically?

10        MR. KARP:  I think it was conveyed to different

11   individuals in different ways.  I won't stop there because

12   Your Honor won't let me stop there.

13        THE COURT:  You are right.

14        MR. KARP:  There were some number of in-person

15   meetings among certain members of management in which

16   Citigroup's investment bank senior personnel reported on

17   developments across a whole range of market events.  One of

18   the market events that was occurring as the fall of 2007

19   progressed was some softening in the sub-prime market

20   particularly insofar as it effected the super senior

21   securities.

22        So certain members of senior management, Your Honor,

23   were apprised orally that there was the possibility of some

24   marked to market losses being taken--

25        THE COURT:  I don't know what you mean by marked--

1          MR. KARP:  It's an accounting mechanism as opposed

2     to an actual loss at the end of day.  Mr. Matt Harris, who

3     was the head of the investment bank at Citigroup, believed

4     until the day he left the company that, at the end of the

5     day, the super seniors would be, in his phrase, was money

6     good.  That, at the end of the day--

7          THE COURT:  They would be safe.

8          MR. KARP:  They would be safe, entirely safe.  There

9     were, however, accounting mechanisms that were requiring that

10    the super senior securities be marked to market.  And when

11    there were observable transactions involving other super

12    senior transactions, there may have been times when

13    accounting adjustments needed to be made to the value.

14          This is what is very important, Your Honor.

15          THE COURT:  So are you telling me that these are not

16    real losses?

17          MR. KARP:  One of the issues is, when the entire

18    process ends and all of these securities have been sold or

19    are matured, we will know what the losses are.  But a number

20    of the losses in recent quarters have been reversed as the

21    market has recovered somewhat.

22          THE COURT:  Right.  But at the point in time when

23    they were saying 300 to 500 million in losses, and then they

24    reassessed that in October perhaps -- is that right?

25          MR. KARP:  Yes.

1          THE COURT:  But when senior management, according to

2     this complaint in September, were informed that there were

3     losses, say 500 million, are you saying to me that these are

4     not necessarily real losses because they're accounting

5     losses, paper losses and you don't know and even today we

6     don't know because maybe --

7          MR. KARP:  Yes, these are marked to market losses.

8     These have to be valued.  And there was an exercise in the

9     fall of 2007 in which the investment bank attempted to value

10     the potential losses associated with these instruments.  So

11     these were accounting driven.

12          THE COURT:  Is it your position that recognizing a

13     loss legally does not necessarily mean for materiality

14     purposes that the sub-prime exposure had been understated in

15     a material way?

16          MR. KARP:  Again, I'm not an accountant and I'm not

17     a disclosure lawyer so I don't want to misspeak.  What I do

18     want to do for Your Honor is lay out the facts as I

19     understand them.  There were marked to market losses.

20     Members of senior management at Citigroup understood that the

21     $43 billion of super senior securities and liquidity puts had

22     suffered at the end of the third quarter a 100 million-dollar

23     marked to market loss.

24          If you do the math, that is less than one quarter of

25     one percent of the value of that cluster of securities.

1    Remembering that Citigroup's balance sheet in the fall of

2    2007 was in access of two trillion dollars, I just want Your

3    Honor to appreciate the context at play, leverage loan losses

4    were the crisis of the day in those meetings.

5         THE COURT:  You are saying that's different than

6    what we're talking about.

7         MR. KARP:  An entirely different bucket of losses.

8         THE COURT:  Let's put it this way.  If you are

9    Mr. Alan Beller -- is he in your firm or some other firm?

10        MR. KARP:  He is at Cleary Gottlieb.

11        THE COURT:  If you get this telephone call and say

12   we have these losses of 100 million on these super senior

13   tranches, is his advice, then you had better go recalculate

14   right away your sub-prime exposure so that the 8K gets

15   changed?

16        MR. KARP:  This is a hypothetical because Mr. Beller

17   was not involved in this process

18        THE COURT:  I'm trying to get some legal help here.

19        MR. KARP:  I'll do the best I can as a litigator.  I

20   think the issue is obviously, as Your Honor knows, what is

21   material, what would a Citigroup shareholder believe was

22   important to understand at the time.  And one of the

23   fundamental legal questions that is going to play out in the

24   civil litigation pending before Judge Stein in the Southern

25   District if we don't win the motions to dismiss, would be was

1    it material for Citigroup not to have disclosed one quarter

2    of one percent of marked to market accounting driven losses

3    in October of 2007.

4         THE COURT:  I thought they disclosed the losses but

5    not the exposure.

6         MR. KARP:  What Citigroup did was disclose that

7    there were losses of a certain magnitude arising from

8    dislocation in the sub-prime markets.  Included in that gross

9    loss figure were losses embedded in the super senior and the

10   liquidity puts.  Citigroup did not expressly disclose that it

11   had $43 billion of super senior and liquidity puts.

12        THE COURT:  Okay.  So, all you are saying is that

13   you don't want to be in Mr. Beller's shoes.

14        MR. KARP:  No, I would rather be a litigator.

15        THE COURT:  I get it.

16        I would like for the following two things be

17   considered.  We might break and resume afterwards.  I think

18   I've asked the questions.  I understand the law to the extent

19   necessary.  I don't know whether the two concerns I have can

20   be addressed.  One is that the word "may" just seems

21   totally -- I'm not signing off on things that allow me to be

22   avoided.

23        MR. KARP:  Your Honor, just a point of clarification

24   here.  It is not my issue.  But I pulled from our binder the

25   consent judgment that Judge Rakoff signed.  And on page eight

1    of the consent judgment in the Bank of America case, it

2    reads: "The Commission may by motion propose a plan to

3    distribute the funds subject to the Court's approval."

4           Obviously it could be rewritten to say "shall."

5           THE COURT:  Yes, that's what I want.

6           MR. KARP:  Yes.  I just wanted to add that to the

7    record for Your Honor's consideration.

8           THE COURT:  He was more careful than I throughout

9    all this.  But I want "shall" and not "may."

10          The second thing is, if the SEC -- and I address

11   this to Ms. Williams -- feels that what is in place is

12   adequate, I need some assurance that what is in place

13   continues and that you, the SEC would approve any changes in

14   the disclosure mechanism.

15          If you feel that they have the state of the art best

16   practices and that nothing could improve upon it, obviously

17   Judge Rakoff didn't see that for Bank of America.  I don't

18   know why one bank is so much more clever than the other.  But

19   let's just assume they are.  Do you have that order?  I have

20   his opinion, but I'm sure whether I have -- is it attached to

21   the Westlaw cite?

22          MR. KARP:  I can hand it up, Your Honor.

23          THE COURT:  The final judgment in the Bank of

24   America case.  I like what he writes about Yogi Berra for one

25   thing.  He cites Yogi Berra: "I wish I had an answer to that

1    because I'm getting tired of answering that question."  Then

2    he quotes from the jurisprudence of Yogi Berry, which was

3    published in Emory Law Review.

4         It's hard not to agree with him.  He talks about the

5    proposed settlement which was made earlier after he forced

6    everybody to actually look at things.  "While considerably

7    improved over the vacuous proposal made last August--"

8         Can I see the judgment?  Thank you.

9         MR. KARP:  You'll have to excuse my markings and the

10   whips.

11        THE COURT:  Perhaps Ms. Williams, is there something

12   that we could do something to address, it does not mean large

13   changes.  But if you are enamored of their proposals, I'm

14   willing to defer to your analysis of them.But I should have

15   some assurance that they exist for a period of time, and

16   they're not changed.  Management can change any day in

17   incorporate America to rely on the fact you've got some

18   person who is now a CEO.

19        What I would like you to do is consider it over the

20   lunch hour, and tell me whether there isn't some small

21   amendments that could be made to say that you've reviewed

22   these.  I assume you have, otherwise you wouldn't state here

23   today that you are satisfied with them.  I hope you feel

24   comfortable with them.  But if you are satisfied with them,

25   why shouldn't they be in place for three to five years.  And

1    the only changes can be made subject to the approval.  If you

2    can agree on what the disclosure, I'm not concerned about

3    compensation.  But I am concerned that proper people are

4    consulted.  One argument here is the lawyers were asleep.  I

5    don't know.  If people saw what you see today, exhibit two,

6    you think that they would have raised red flag.  I don't know

7    where they were.  But now that you think that there seems to

8    be a procedure in place to make sure that this doesn't happen

9    again.

10          I would suggest that we take a break and come back

11   and see whether we can't make a few adjustments that would go

12   to the remedy because I see the remedy here as just

13   financial.

14          Mr. Karp thinks that the idea that Citigroup is

15   committing themselves to obey the law is more meaningful than

16   I think it is.  They're supposed to be obeying the law

17   without having to write it down.

18          MS. WILLIAMS:  If I may, I would be happy to discuss

19   Your Honor's proposal over the lunch break.  One thing I did

20   want to note is that the relief that we seek is, has to be

21   authorized by the Commission.  So we all we could do is make

22   a recommendation to the Commission if we were able to reach

23   an agreement with regard to the proposals that Your Honor

24   makes.

25          The other thing I just want to note is we carefully

1    considered all of the facts and circumstances regarding

2    Citigroup's disclosures processes and their changes in

3    management.  We don't have a practice of blessings disclosure

4    practices.  What we did was consider the changes in

5    determining what relief we thought was appropriate.

6         We also for policy reasons, and other

7    considerations, we don't generally bless or vouch for.  What

8    we do is consider them in determining what additional relief

9    we think would best protect investors here.  So we would be

10   happy to consider and I'd like to be able to talk to the

11   counsel from the commission over lunch.

12        THE COURT:  Fine.  Let us resume at quarter to 2:00.

13   It seems to me that, when they come up with some kind of

14   remedial scheme, do not have it in the agreement is

15   meaningless, frankly.  If you are satisfied with the remedial

16   scheme in place, nobody has ever made that clear to me.  And

17   it is certainly not in the judgment.  You'll have chance to

18   talk to your counsel by 2:00?

19        MS. WILLIAMS:  Yes, Your Honor.

20        THE COURT:  All right.  We'll resume at 2:00.  Thank

21   you.

22        (A luncheon recess was taken.)

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    AFTERNOON SESSION

2          THE COURT:  Perhaps Ms. Williams has something to

3     report.

4          MS. WILLIAMS:  Yes, Your Honor.  During the break we

5     did meet with Citigroup and we also had a discussion with

6     some senior members of the Enforcement Division.

7          We are prepared to modify the consent here and

8     submit a revised consent and proposed judgment that would

9     include an undertaking requiring Citigroup to maintain

10    certain disclosure policies and procedures.

11         What we wanted to ask the Court for a short period

12    of time, two weeks, so that we can draft the language and get

13    it approved by the Commission and then be able to submit that

14    revised consent and proposed judgment to Your Honor.

15         THE COURT:  Okay.  I think that would be helpful.  I

16    went back and looked at the final judgment entered in the

17    Bank of America case which has some useful language

18    certainly.  I would like to accomplish something reassuring

19    in that way.  That this whole lawsuit isn't just about

20    figuring out what is the reasonable amount of a penalty.

21    Because that's really very unrelated to much of anything if

22    you want to know the truth.  I mean, 75 million, the more you

23    look at it, you've done your best analysis.  You've had an

24    expert analyze it.  So, you would be submitting to me and you

25    get rid of those words "may"--

1          MS. WILLIAMS:  Yes, Your Honor.

2          THE COURT:  I think that for purposes of--

3          And you are in agreement, Mr. Karp?  Do you have any

4     more specifics regarding this provision that you discussed

5     over the lunch hour?  What kinds of policies and procedures

6     are we talking about?

7          MR. KARP:  What we were going to do, Your Honor, is

8     to share in some detail with the SEC Citigroup's current

9     enhanced disclosure policies and procedures regarding

10    earnings announcements and the earnings disclosures process.

11         The SEC is going review those policies and

12    procedures again, is going to build them into revised

13    revision in the consent that will be submitted to Your Honor.

14         When I stood before you this morning, I described

15    those policies and procedures in some degree of detail.  But

16    we will provide the SEC and obviously we will provide the

17    Court with whatever additional information you believe and

18    the SEC believes is necessary.

19         But Citigroup's intention is to maintain and

20    continue to strengthen those policies and procedures going

21    forward.  There may of course be reasons for modifications at

22    various times.

23         THE COURT:  Right.  Obviously, there are things that

24    may happen in the future which is why I threw out the

25    suggestion of the ability to change them.  Obviously, this

1    does not continue ad infinitum anyway.  There will be a time

2    certain.

3         But I would like to know what policies and

4    procedures, perhaps they cross reference so that, if you are

5    going to submit them to the SEC and the SEC is going to

6    incorporate them in some fashion, there may be some policies

7    and procedures that are ignored or irrelevant, I would like

8    to know what it is that you are incorporating in the

9    agreement specifically.  And there may be a way to have a

10   document attached.  It may be that your disclosure

11   protections are set forth someplace so that in fact they can

12   be incorporated by reference in the Court's judgment.

13            MR. KARP:  We can accommodate that, Your Honor.

14            THE COURT:  And Citigroup did answer many of my

15   questions.  But much to my surprise, the key question came to

16   for me as we went along.  I think I understand the evidence

17   and I understand why there has not been a charge of scienter.

18   I think that reasonable minds can differ.  But this is

19   compromise, this is a consent decree.  Therefore, I don't

20   think it is my job to tell the SEC to go try to prove

21   scienter and maybe they would fail.

22            But it is my job in terms of the public to try to

23   make sure that we are assured that the procedures in place

24   going forward address the problems that have occurred.  I

25   think it is important, I am willing to, subject to this

1    provision, to agree to the judgment that has been proposed

2    except for this portion needs to be added.

3            I think it is important to say that my discretion is

4    very, very limited.  People think that I have the ability to

5    tell the SEC who to charge, how to charge, what to charge.

6    That is not consistent with circuit law.

7            The Microsoft case says I do not have the ability to

8    redraft the complaint.  So whether I think there could be a

9    case of a 10(B)5 or whether I think that they should have

10   gone after higher-ups is next to irrelevant.  My powers are

11   limited to making sure that this is adequate, reasonable and

12   that it is a fair settlement.

13           And within those contours of what my job is, I think

14   Judge Rakoff came to the same conclusion, I have to defer to

15   the expertise of the agency.  They have looked at 28 million

16   documents or pages.  I don't think that it is my job nor

17   would I like to take on the job of looking at 28 million

18   documents.

19           They also did 14 depositions and interviewed scores

20   of people.  This is not like the Bank of America case where

21   the SEC came to the court having not conducted an in depth

22   interview.

23           I then asked series of questions and you responded

24   and so did Citigroup.  So that I feel fairly confident that

25   I've performed the function that has been given to me under

1    the law.

2          But the one component that I'm not satisfied with,

3    but it sounds like we'll be able to reach -- you two will be

4    able to reach agreement and I will find it satisfactory, is

5    to make sure that the procedures in place satisfy both me and

6    the SEC.   And I think that what happened here is that nobody

7    really examined what you have.

8          You may have the best practices there are.   But I

9    wouldn't know that sitting here.   And I wouldn't know it even

10   if you told me what they were, to be truthful.   So that's why

11   the law tells me I have to defer to the SEC.

12         But for the benefit of the public -- perhaps you

13   ought to take a seat, Mr. Karp.

14         MR. KARP:   Thank you, Your Honor.

15         THE COURT:   You are welcome.

16         I think the public has to realize that there is

17   substantial differences between this case and the Bank of

18   America case.   And that's why I think it is important, first

19   of all, that we get it clearly established on the record what

20   various levels of culpability, what the law means and what

21   the facts are here because, often especially given the

22   financial melt down, it is easy to sort of assume things.

23   And read the complaints, the complaints sound a lot better

24   than the consent decree in terms of making allegations.

25         Until you start to tease these things out you don't

1    know enough to judge the consent decree.  I think it is the

2    job of the government to make sure both the public and the

3    Court understand both the law and the facts.  And that's why

4    we spent so much time on this.

5          But, as I was going through this, I realized that

6    there were substantial differences here between this case and

7    Bank of America where the Court did reject the initial

8    proposal.

9          Here, we've had a lengthy investigation.  It appears

10   that the government has done the job of looking at it.

11   Whether I would reach the same conclusions at the end of the

12   day is irrelevant.  It is the SEC's responsibility to look at

13   these matters, investigate them and conclude what is a fair

14   charging document, which I think has been done here.

15         Second of all, I don't believe in the Bank of

16   America they had an economic analysis of the pecuniary gain

17   to the company.  Obviously, it is a very inexact science.

18   But at least there was an undertaking to show that the gain

19   was ranged from zero to 123 million.  So, 75 million-dollar

20   penalty in my view falls within the range.  And it appears to

21   be consistent with the guidelines of the SEC as well as other

22   settlements.  It is a very inexact science.  But I don't know

23   any other way to go about doing it than the way it was done

24   here.

25         The 75 million, I know Mr. Miller may not agree, but

1    is certainly not designed to impose a great hardship on the

2    current shareholders.  Under the fair fund that will occur

3    here, those people who were harmed perhaps the most will get

4    the benefit from the fund.  Those who had access to and

5    should have known better perhaps will not participate.

6          And I think we're defining the shareholders to be

7    officers, directors and employees who knew or should have

8    known or had access to the information will not benefit in

9    the fund so that there is some accountability here.

10          Also it is important, unlike the Bank of America, we

11   do have two individuals who have paid it seems like a very

12   small civil penalty.  But it appears there was no pecuniary

13   gain to them.  So it is based on the Remedies Act and the

14   number of violations.  There is nothing about those penalties

15   that are not consistent with the statute once the case is

16   defined the way the SEC has defined it.

17          Second of all, under Supreme Court precedent,

18   Heckler versus Chaney, I have absolutely no control over who

19   the SEC charges or doesn't charge.  So once they charged

20   these two individuals and they settled in an administrative

21   proceeding, it is beyond my purview entirely.

22          So again, there are limitations that the Court must

23   recognize regarding who and how much, when it comes to the

24   individuals.  It is not my job to tell the SEC how to run

25   their business or who to charge, especially since they can do

1    it in an administrative proceeding that has no court approval

2    process involved.

3         Also we didn't have a state complaint here.  There

4    was a rather powerful set of allegations in the Bank of

5    America case made by the Attorney General which would at

6    least provide arguably an evidentiary basis for scienter.

7    Here, the SEC has made its decision.  I know from my own

8    practice in private practice, the difference between scienter

9    negligence, willful blindness, these are shades that are very

10   hard to prove.  It is certainly not a sure bet that anybody

11   can prove scienter in these kinds of cases.

12        So the sum total is that I'm satisfied with the

13   75 million as a penalty.

14        I appreciate Mr. Miller's comments.  Since I am

15   going to ultimately approve the settlement, we're not going

16   to have another hearing.  I'll see what we have submitted to

17   me.  If I have any questions, we'll set a hearing.  But I

18   don't need one.  I'm not going to formally allow amicus.  I

19   have considered their remedial suggestions, not the

20   suggestions of who should be charged or whether or not, I

21   don't agree that I should reject the settlement entirely.

22   But the comments were helpful.  But I don't think it is

23   appropriate to have him declared as amicus so I will deny

24   that motion and the Bear Stearns case is certainly somewhat

25   similar and they denied the amicus status in that one as

1    well.

2             So I would expect that you would send me this within

3    two weeks, I will have a new final judgment proposed.  And if

4    you would kindly just bold what is new so I understand what

5    exactly was done.

6             I'd also like to point out one other thing that I

7    thought was significant.  This is not a case where ultimately

8    anybody, unless they were terribly clever or there was inside

9    trading, this stock lost 91 percent of its value which you

10   pointed out last time.  I went back to look.  It went from a

11   high of 54, and it lost $10 per share around the time that

12   the difference between the, when after post disclosure of the

13   50 some billion exposure.  But it then precipitously dropped

14   to $3.91.

15            I guess as a final matter, I have looked carefully

16   at the evidence.  I think probably you would have a big fight

17   on your hands with respect to materiality.  If there is no

18   duty to disclose the exposure at all, it gets complicated to

19   say the least, where there is half a disclosure, they seem to

20   be penalized compared to their competitors who didn't

21   disclose anything.

22            This is a far more gray area type case than some.

23   So, I will look forward to seeing the adjusted judgment and I

24   appreciate the efforts of all counsel.

25            So you will submit it on ECF within two weeks

1    please.

2           MS. WILLIAMS:  Yes, Your Honor.

3           THE COURT:  Okay.

4           Thank you.

5           (Whereupon, at 2:18 P.M., the hearing concluded.)

6

7

8                    CERTIFICATE OF REPORTER

9

10          I, Lisa Walker Griffith, certify that the foregoing

11   is a correct transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15

16   _____    _____

     Lisa Walker Griffith, RPR                    Date
17

18

19

20

21

22

23

24

25